LEON E. HENDRICKSON AND RUHAMA P. HENDRICKSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Repondent
Hendrickson v. Commissioner
Docket No. 3291-78.
United States Tax Court
T.C. Memo 1983-560; 1983 Tax Ct. Memo LEXIS 231; 46 T.C.M. (CCH) 1363; T.C.M. (RIA) 83560; September 12, 1983. *231 Robert E. Johnson and Geoffrey P. Gooch, for the petitioners. Elsie Hall, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioners' Federal income tax for the taxable years 1973, 1974, and 1975 in the amounts of $3,438,754.71, $1,992,116.31, and $184,852.52, respectively. The issues for decision are: (1) Whether petitioners understated their gross income by overstating their cost of goods sold; and (2) to what extent, if at all, petitioners purchased merchandise for cash in addition to the amount allowed by the Commissioner in his notice of deficiency. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and exhibits are incorporated herein by this reference. Petitioners Leon E. Hendrickson and Ruhama P. Hendrickson are husband and wife and were residents of Winchester, Indiana, when they filed their petition in this case. Petitioners filed joint Federal income tax returns for the taxable years 1973, 1974, and 1975.
During the years in issue, petitioner Leon Hendrickson's unincorporated business, "Silver Towne," engaged in the business *232 of buying and selling coins and bullion (references to petitioner in the singular herein will refer to Leon Hendrickson). The bulk of petitioner's business took place at coin shows or at his business in the basement of his home in Winchester, Indiana, where he transacted business by telephone, teletype, or in person. Petitioner was a "dealer's dealer" or a "wholesale dealer" in that a substantial portion of his business was consummated with other coin dealers. Many of these were fairly small dealers, known as "vest pocket dealers," a term referring to people who hold other jobs and have small inventories of coins. During the years in question petitioner was primarily buying from the small coin dealers and reselling to the large coin dealers. Petitioner was a high-volume, low-margin dealer. He had one of the largest volumes of all coin dealers. Petitioner's profit margin varied between 1 percent and 2 percent. Another coin dealer who dealt with petitioner, Dr. George W. Vogt, operating under the name of Colonial Coins, Inc., regarded a 1 percent margin as "a happy situation." James Horne, also a dealer, needed a profit margin of 5 percent and found it difficult to compete with *233 petitioner because petitioner's profit margin was 1 to 2 percent. The petitioner had numerous, short-term loan transactions with other coin dealers, Bob Norman, John Dowd, John Love, Gary Fillers, John Hamrick, Ed Clemente, and John Engle and his wholly owned corporation, Engles Coin Shop, Inc. (for convenience hereinafter referred to as Engles), the coin dealer whose loan transactions with the petitioner are the subject of the Commissioner's determination on this issue. Such loan were common practice among the coin dealers with whom petitioner dealt. The purpose of these loans was to assure the availability of funds when the opportunity arose to make purchases. To make this possible, petitioner exchanged pre-signed checks with other coin dealers; the petitioner gave his pre-signed checks to at least seven other dealers, some of whom also gave him their presigned checks.The pre-signed checks given by the petitioner to other coin dealers sometimes had the payee's name inserted by petitioner but the amount was always left blank. In addition to begin used for immediate, short-term loans, these checks were also used to get quick payment for merchandise purchased by the other dealers *234 on behalf of petitioner. These "dealer loans" were very short term, generally being repaid within a few days or a week. No interest was charged. The loan checks were not identified on their face as loan checks. Petitioner maintained informal records of these loans for the following coin dealers covering the periods indicated: Coin Dealer
Period Covered
Ed Clemente
March 1972 - April 1974
Bob Norman
May 1973 - April 28, 1974
John Dowd
May 1973 - April 28, 1974
Engles
May 1973 - April 28, 1974
John Love
May 1973 - April 28, 1974
Gary Fillers
May 1973 - April 28, 1974
John Hamrick
April 29, 1974 - 1976
Gary Fillers
April 29, 1974 - 1976
Engles
April 29, 1974 - 1976
John Dowd
April 29, 1974 - 1976
El Clemente
April 29, 1974 - 1976
Before another coin dealer would use one of petitioner's blank, pre-signed checks, he would contact the petitioner (or perhaps his wife, or one of his other key employees) and obtain permission to issue the check for a certain amount. The loans were not evidenced by any promissory notes or contracts. The loans were based upon trust and friendship among the coin dealers. The petitioner's reputation among coin dealers *235 was impeccable. For the years from 1967 through 1970 petitioner recorded his loans to other coin dealers in an account separate from the merchandise purchases account. He likewise recorded separately his loans from other coin dealers. George Armacost, the Internal Revenue Service Agent who examined petitioners' 1967, 1968, and 1969 Federal income tax returns, recommended that, for simplicity, petitioner should record all loans to other coin dealers in the purchases account and all repayments of such loans in the sales account. He further recommended that petitioner should record all loans from other coin dealers in the sales account and all repayments of these latter loans in the purchases account. Petitioner's accountant, Mr. Waddell, explained to petitioner that there would not be any effect on net income if such a practice were employed. Beginning in January 1971, the first year following the completion of the examination by Revenue Agent Armacost, petitioner followed the recommendation of Mr. Armacost and commingled the entries on dealers' loans with the purchases and sales entries. Specifically, these entries included loans between petitioner and Engles. Petitioner included *236 loans to Engles in purchases and included loan repayments from Engles in sales. Petitioner continued this practice from January of 1971 through the end of March 1974. During the period of time that petitioner was reflecting his dealer loan transactions in merchandise purchases and sales, he became concerned about how the practice inflated both his purchases and sales. Purchases and gross sales reflected in his books were as follows: Purchases
Sales
1971
$5,961,546.66
$6,073,841.43
1972
8,782,169.50
8,949,393.34
1973
27,410,811.29
27,690,543.68
Eventually this concern led petitioner to consider abandoning the method Mr. Armacost had suggested. After again talking to Mr. Waddell, petitioner, in April of 1974, stopped including his dealer loan transactions in both merchandise purchases and sales. Miss Butts, petitioner's bookkeeper, had already posted part of the April books under the old method. Petitioner and Miss Butts worked together to make corrections to the April books to reflect the new method of recording the dealer loans. They did not go back and correct the books for the first three months of 1974. Petitioner's books and the income *237 tax returns for 1974 and 1975 reflected purchases and gross sales as follows: Purchases
Sales
1974
$35,179,628.06
$35,626,010.62
1975
17,300,837.99
17,335,191.51
Petitioners' 1973, 1974, and 1975 Federal income tax returns were examined by Internal Revenue Service Agent Nathan Howard who began the examination in September 1975. Petitioner made his business records available to Mr. Howard. Certain loan ledgers were misplaced during the IRS examination. Mr. Howard was shown reconstructions of these loan records. Petitioner never concealed his books or records from representatives of the IRS. Mr. Howard was informed by petitioner from the very first day that petitioner had numerous short-term loans with other coin dealers and that for all of 1973 and for a portion of 1974 the dealer loan transactions were reflected in petitioner's purchases and sales. Petitioner's books identified numerous short-term loans between petitioner and the following coin dealers: Engles, John Dowd, Gary Fillers, Bob Norman, John Love, John Hamrick, and Ed Clemente. During his review of petitioner's records, Mr. Howard saw references to loans and loan repayments between the *238 petitioner and other coin dealers and monthly summaries of the loans outstanding. These references included references to loans with Engles. Mr. Howard compared Engles' and petitioner's books and records and then disallowed all of the Engles items shown as purchases on petitioner's books which were shown as loans on Engles' books. He determined that these amounts represented loan transactions between petitioner and Engles. Mr. Howard made no effort to trace repayments of the Engles loans to the sales account on petitioner's books. Petitioners maintained one of their checking accounts for the Silver Towne coin business at the Greensfork Township State Bank in Spartanburg, Indiana. The original deposit slips contained lists of all checks deposited to petitioners' account and all cash withheld from deposits. The bank also prepared microfilm of all checks deposited to the customers' accounts and all checks presented for payment against such accounts. In 1978 a leaking roof damaged all of the original deposit slips of the bank, including those for petitioners' account for 1973 and 1974, and they were destroyed. Without the deposit slips, it was extremely difficult to trace checks *239 deposited to petitioners' account by use of the microfilm and it was impossible to ascertain the extent to which cash was withheld from deposits in the bank account. In order to assist counsel for respondent in preparing for trial and to stipulate facts, Agent Howard went to the Greensfork bank and attempted to trace Engles' checks into petitioners' account but after scanning the microfilm for 2-1/2 days he left because it was too tedious to do without the deposit slips that the bank had destroyed. The Commissioner issued a statutory notice of deficiency to the petitioners on the basis of Mr. Howard's report. In that notice of deficiency the Commissioner disallowed cost of goods sold of $4,935,060 in 1973 and $2,102,736 in 1974 with the explanation that these represented "[l]oans rather than purchases." No adjustment was made to reflect loan proceeds and loan repayments included in petitioner's sales, nor was it determined that ascertaining the correct amount of such an adjustment was not possible. The Commissioner also disallowed $405,341 in 1973, $975,773 in 1974, and $310,623 in 1975 as purchases of merchandise for cash that had not been substantiated. Neither the revenue *240 agent nor the Commissioner made any adjustments to petitioner's inventory. The Commissioner's disallowance of petitioner's claimed cash purchases consisted of disallowing all of petitioner's claimed purchases by cash, as opposed to check, for each of the years at issue. The petitioner purchased the following amount of merchandise for cash in excess of the amounts determined by the Commissioner in his statutory notice of deficiency: Year
Amount
1973
$146,957
1974
715,140
1975
264,631
In the companion cases of Engles Coin Shop, Inc. v. Commissioner, docket No. 1121-78, and John R. Engle and Linda Engle v. Commissioner, docket No. 1122-78, which were heard at the same time as the instant case, the Commissioner determined that Engle failed to report sales to Hendrickson and others as follows: Year
Amount
1973
$5,109,885.62
1974
3,697,359.74
1975
20,005.00
The Commissioner made no adjustments to the returns of Engles to reflect repayments of loans to Hendrickson. In the Engle cases the Commissioner conceded the above adjustments in his opening brief. Those cases are reported at T.C. Memo. 1983-561 under the style, *241 Engles Coin Shop, Inc. v. Commissioner.
OPINION The first issue to be decided is whether petitioners overstated their cost of goods sold and, if so, to what extent. They recorded short-term business loans to Engles Coin Shop, Inc., to John Engle, and to others in their purchases account and the repayments of such loans in their sales account for most of the taxable periods involved here. As explained above, the Commissioner, in his statutory notice of deficiency, disallowed the loans to Engles as cost of goods sold but made no adjustments to the sales account for repayments of such loans. The burden of going forward with the evidence on this issue in this case is on respondent. His burden is to make a prima facie showing that the sales accounts of petitioners for 1973 and 1974 do not contain loan repayments from Engles. Respondent called only two witnesses, Revenue Agent Nathan Howard and Special Agent Donald G. Beadle. Agent Howard's work papers and bank reconciliations were received into evidence through his testimony. He testified as to some of the steps he took in his examination of petitioners' income tax returns. Special Agent Beadle did not participate in *242 the examination of petitioners' returns but interviewed petitioner in connection with the examination of Ed Clemente's returns. He obtained bank statements, cancelled checks, and invoices from petitioner which he returned to him. The testimony of respondent's witnesses and the evidence offered by respondent is insufficient to make a prima facie case that there were no loan repayments by Engles recorded in petitioner's sales accounts for 1973 and 1974. [1]
If we consider the entire record, there is overwhelming evidence that Engles' loan repayments were recorded in the sales accounts and that they were repaid in full in 1973 and 1974. There is no evidence of any kind to the contrary. There are no inconsistencies in the testimony as to the Engle loan repayments or the recordation of them in petitioners' sales accounts. Accordingly, we hold that respondent failed to make a prima facie case as to this issue and the burden of going forward with countervailing evidence did not shift to petitioners. We, therefore, hold for petitioners on this *243 issue. In view of our holding it is unnecessary for us to decide whether petitioners may rely upon an indirect method of proving cost of goods sold and, further, whether such proof is adequate. The second issue concerns the portion of petitioner's cost of goods sold disallowed for lack of substantiation. Petitioner's books and records in this regard leave a great deal to be desired. Petitioner presented to this Court as evidence numerous purchase order vouchers for cash purchases, only some of which are dated. Although many of these vouchers are corroborated by dated cancelled checks where the purchase was made in part by cash and in part by check, there remain numerous undated vouchers. Petitioner contends that he kept the vouchers segregated by month so that the vouchers are properly to be included in the computation of cost of goods sold for the years in issue. Petitioner further contends that, while he has no documentation to substantiate portions of his cost of goods sold, the proper records existed but were not retained or in some instances never existed because his employees were too busy to prepare them. Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930), *244 permits a determination of petitioners' cost of goods sold where substantiation is incomplete but, in applying the "Cohan" rule, we must bear heavily upon the taxpayer whose inexactitude is of his own making. Accordingly, we hold that petitioner had adequately substantiated only that portion of cash purchases of cost of goods sold for which he had produced dated purchase vouchers. These amounts are set forth in detail in our findings of fact. Decision will be entered under Rule 155.
Footnotes
1. See Sipes v. Commissioner,T.C. Memo. 1977-146↩, affd. per curiam in unpublished opinion (4th Cir., Aug. 21, 1979).