T.C. Memo. 1999-122


UNITED STATES TAX COURT


HANS C. SHERRER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 15292-96.          Filed April 13, 1999.


<u>Emily Simon</u>, <u>Joseph Wetzel</u>, <u>Gary R. DeFrang</u>, and <u>Russell A. Sandor</u>, for petitioner.

<u>Shirley M. Francis</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

BEGHE, <u>Judge</u>:  Respondent determined the following deficiencies in, and additions to, petitioner's Federal income and self-employment taxes for 1989-94:

| Year | Deficiency | Additions to Tax | | |
|------|------------|----------------|----------------|----------|
| | | Sec. 6651(a) | Sec. 6651(f) | Sec. 6654 |
| 1989 | $18,328 | -- | $13,746 | $1,240 |
| 1990 | 57,912 | -- | 43,434 | 3,792 |
| 1991 | 66,994 | -- | 50,246 | 3,829 |
| 1992 | 48,870 | -- | 36,653 | 2,132 |
| 1993 | 9,293 | -- | 3,206 | 389 |
| 1994 | 9,603 | $2,401 | -- | 498 |

All section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise specified.

Following the concession by respondent of the section 6651(f) addition for 1993, the principal issues remaining for decision are:

1.  Whether petitioner is entitled to deductions, in excess of the amounts allowed by respondent for each of the years 1989-92, on account of business expenses paid with cash.

2.  Whether petitioner's failure to file Federal income tax returns for each of the years 1989-92 was "fraudulent" within the meaning of section 6651(f).

3.  Whether respondent's determinations of petitioner's unreported income for 1993 and 1994 should be sustained.

4.  Whether the section 6651(a) addition applies to petitioner's failure to file a return for 1994.

5.  Whether petitioner is liable for the section 6654 addition for failure to pay estimated tax for each of the years 1989-94.

We sustain all of respondent's determinations, except that we allow additional deductions, in amounts less than those claimed by petitioner, for the years 1990-92 for business expenses paid in cash, resulting in corresponding adjustments to the income tax deficiencies and the additions to tax for those years.

## FINDINGS OF FACT

Most of the facts have been stipulated and are so found; the stipulation of facts and related exhibits are incorporated by this reference.

Petitioner resided in Vancouver, Washington, at the time the petition was filed.

Petitioner worked as a plumber and plumbing subcontractor during each of the years in issue (1989-94). Petitioner conducted this business as a sole proprietorship under the name "Down to Earth Plumbing".

Petitioner earned gross income from his plumbing business in each of the years in issue, and his petition acknowledges that he had taxable income (and still owes tax) for each of those years. Nevertheless, petitioner did not file income tax returns for any of the years in issue. In addition, as of February 1998, no payments or credits had been made to petitioner's income tax account for the years in issue, other than a few small payments in 1996.

## Petitioner's Filing History

Petitioner's repeated failures to file returns did not begin with the first year in issue. Petitioner's history of nonfiling began more than 20 years ago, with his filing of a "tax protester" return for 1975.

Petitioner filed proper income tax returns for 1973 and 1974. Petitioner's 1975 return was a "tax protester" return, accompanied by voluminous materials advancing arguments now generally dismissed by courts as having no merit, e.g., that Federal Reserve Notes are neither "lawful money" nor "dollars", that the Fifth Amendment relieves taxpayers of the obligation to file tax returns, etc. Because a tax liability could not be computed from petitioner's 1975 return, the Commissioner reconstructed petitioner's income for that year, and determined a deficiency. Petitioner contested that deficiency in this Court; we sustained the Commissioner's determination in 1978.

Petitioner also filed a "tax protester" return for 1976. The Commissioner did not consider this document a valid "return". In addition, petitioner did not file any Federal income tax return document for 1977.

In January 1980, petitioner was convicted of willful failure to file Federal income tax returns for 1976 and 1977, and of the criminal supplying of a false withholding certificate to his employer for 1977. Petitioner was sentenced to prison for 1 year. In a letter written to the U.S. probation officer prior to sentencing, petitioner stated that he believed he was acting as

the Constitution and law allowed when he filed his 1976 return document and failed to file his 1977 return. However, he also stated that:

> When anyone has asked me, I tell them that they should not attempt to take on the government as I did and that they should file their proper returns. * * *

> * * * * * * *

> I do not belong to any tax protest groups and I do not intend to join any in the near or distant future. If asked by anyone, I will always inform them to comply with the tax laws and file tax returns so that what happened to me will not happen to them. * * *

Petitioner did not file an income tax return for 1978 (the year following the second of the 2 years for which he was convicted of willful failure to file), or for any year during the period 1979-94.

Respondent did at one time conduct a criminal investigation of petitioner, with respect to at least some of the years in issue.

## Petitioner's Lack of Records and Dealing in Cash

Petitioner was responsible for the recordkeeping of his plumbing business. During the years in issue, petitioner did not maintain as books and records any invoices, receipts for cash disbursements, general ledger, cash receipts journal, or cash disbursements journal. Petitioner has not produced any business or accounting records relating to the years in issue for respondent to examine.

During the years 1989-92, petitioner withdrew currency from his bank accounts in the following amounts:

| Year | Amount of Currency Withdrawn |
|------|------------------------------|
| 1989 | $154,000 |
| 1990 | 333,645 |
| 1991 | 232,750 |
| 1992 | 88,525 |

Petitioner's Use of an Incorrect Social Security Number

During each year in issue, petitioner used the same incorrect Social Security number on the invoices he submitted to, and on his contracts with, general contractors for construction projects. Petitioner had used his correct Social Security number on the income tax returns he filed for 1973, 1974, and 1975.

Petitioner's Use of a Bahamian Bank Account

During 1989-92, petitioner received payments for services from E.A. White Construction Co. (White Co.) totaling $183,285. In 1993, petitioner lent $200,000 to White Co. and received $20,558 in interest from White Co.

In December 1994, petitioner deposited a White Co. check payable to Down to Earth Plumbing, in the amount of $46,000, with a bank in Nassau, Bahamas. In September and October 1995, U.S. Customs officials seized three additional White Co. checks payable to petitioner's business, in the total amount of $57,274, which had been sent for deposit at the same Bahamian bank. By letter dated January 1996, petitioner, through his attorney, filed a claim with U.S. Customs that he was the owner of the three White Co. checks seized in 1995, which he had received in the ordinary course of his plumbing business.

The admissibility of these facts concerning petitioner's use of a Bahamian bank account is considered <u>infra</u> pp. 27-32.

<u>Respondent's Reconstruction of Petitioner's Income for 1989-92</u>

Due to the lack of returns and records, respondent reconstructed petitioner's income for each of the years in issue. Respondent used the "specific items" method to reconstruct petitioner's income for 1989-92, in the following manner.

Respondent contacted the payers (i.e., general contractors) for whom petitioner performed services in 1989-92, to obtain information about payments made to petitioner (or to petitioner's sole proprietorship, Down to Earth Plumbing). Respondent determined petitioner's gross receipts for 1989-92 by adding the amounts payable on the copies of checks provided by these payers.

Respondent then summonsed petitioner's bank records, to reconstruct petitioner's expenses for 1989-92. Respondent treated almost all checks written by petitioner during those years--other than checks payable to petitioner or to cash--as having been used to pay deductible business expenses.

Finally, respondent determined petitioner's unreported net business income for 1989-92 by subtracting allowed expenses from gross receipts.

Petitioner's gross receipts, allowed business expenses, and unreported net business income for 1989-92 as so determined by respondent were:

|  | 1989 | 1990 | 1991 | 1992 |
|---|---|---|---|---|
| Gross receipts | $336,545 | $450,252 | $476,785 | $234,677 |
| Allowed business expenses | 280,733 | 264,280 | 271,515 | 103,262 |
| Unreported net business income | 55,812 | 185,972 | 205,270 | 131,415 |
| Allowed expenses as a percentage of gross receipts | 83.4% | 58.7% | 56.9% | 44.0% |

Respondent's Reconstruction of Petitioner's Income for 1993-94

Respondent did not use the "specific items" method to reconstruct petitioner's income for 1993 and 1994.  Instead, respondent determined petitioner's income by reference to Bureau of Labor Statistics average cost-of-living survey information. Using this information, respondent determined that petitioner had a cost of living--and therefore must have had unreported net business income--of $34,533 and $35,638, in 1993 and 1994 respectively.  After allowing petitioner one personal exemption, the standard deduction, and a deduction for self-employment tax, respondent determined that petitioner's taxable income was $26,043 and $26,870 in 1993 and 1994, respectively.

OPINION

I.   Is Petitioner Entitled to Additional Deductions for 1989-92?

Prior to trial, the parties stipulated that petitioner's gross receipts for 1989-92 were equal to the amounts determined by respondent.  The parties also stipulated that petitioner's unreported net business income for 1989-92 was equal to the

amounts determined by respondent--without taking into account "any possible undocumented business expenses paid with currency, money orders, or non-traceable documents".

As a result, with respect to respondent's deficiency determinations for 1989-92, we need only consider whether petitioner is entitled to any additional deductions on account of business expenses paid in cash. Respondent has determined (and urges us to hold) that petitioner is not entitled to any such additional deductions for 1989-92. Petitioner asserts that he paid hundreds of thousands of dollars of business expenses in cash during those years.

A.  The Evidence--Petitioner's Expert's Report

The only evidence petitioner offered was the expert's report (and related exhibits) and testimony of Edward W. Sager, a certified public accountant with experience in the construction industry.

Mr. Sager's report does not identify any specific expenses, or any class of expenses, paid by petitioner in cash during the years in issue. The report also does not attempt to calculate petitioner's actual receipts, expenses, or taxable income for any of those years. Due to "a lack of record keeping" and "the lack of hard financial record", Mr. Sager instead tried to estimate a "reasonable annual income level" for petitioner, for each of the years in issue. The estimates in Mr. Sager's report were based primarily on two sources:  (1) Respondent's reconstruction of petitioner's gross receipts; and (2) information regarding

petitioner's bidding procedures and costs supplied by petitioner to Mr. Sager.

In his testimony, Mr. Sager referred to two sets of documents that he used in the preparation of his report. The first set was 36 pages of photocopies of various money orders (and a few receipts) assertedly representing expenses paid by petitioner in cash. The second set was seven 1-page "bid sheets," assertedly representing petitioner's estimates of cost and profit for seven plumbing jobs.

The parties agreed that these documents were hearsay. Accordingly, we admitted them only for the purpose of learning about the basis for Mr. Sager's testimony and report; we did not admit them as proof of the matters asserted therein.

B. Copies of Money Orders and Receipts

At trial, it became clear that Mr. Sager relied on the copies of money orders and receipts only to a limited extent in preparing his report. Mr. Sager testified that when he reviewed petitioner's money orders and receipts, he did not try to justify any of them as an actual business expense. He further said that he could not tell which of the money orders represented business expenses and which personal expenses. As petitioner's counsel stated and Mr. Sager confirmed, the copies of money orders were offered solely to show that when petitioner told Mr. Sager that petitioner paid expenses in cash, Mr. Sager "saw things that looked in that nature".

In fact, most of the copies of money orders included in the exhibits show only payees and amounts, with no description of the associated expenses. Some of the money orders represent expenses that were almost certainly personal, such as the orders payable to "Psychology Today" and "New Woman", and the order apparently payable to "Inside Sports". Other money orders represent credit card payments, with no information about the underlying charges. In addition, the payments represented by the copies of money orders and receipts entered into evidence are de minimis, relative to the hundreds of thousands of dollars of cash expenses petitioner urges us to find.

For all these reasons, the copies of money orders and receipts provide no support for the estimates of petitioner's income contained in Mr. Sager's report, or for petitioner's assertion that he paid business expenses in cash.

C. The Bid Sheets and Related Estimates

Mr. Sager also testified about copies of seven 1-page "bid sheets" that he used in the preparation of his report. Each of these handwritten sheets--which Mr. Sager obtained from petitioner--assertedly represents petitioner's estimates of cost and profit for a plumbing job.

The bid sheets are quite summary and without supporting documentation. Each of the bid sheets sets forth five broad categories of expense: "Labor"; "Material"; "Water Heaters"; "Miscellaneous Job Expenses"; and "Travel Expenses". Following these categories, each sheet has a "Sub-Total" line; a "Profit"

line, and a "Net Bid" line. The entries under each category provide little information beyond quantities and dollar amounts.

Mr. Sager used the bid sheets to estimate petitioner's income in the following way. Mr. Sager examined the dollar amount entered on the "Profit" line on each of the seven bid sheets, as a percentage of the amount entered on the "Net Bid" line. Mr. Sager then looked for other potential sources of profit, such as a 5-percent "Weather Factor" included in the "Labor" amounts, and 2- to 5-percent factors applied to certain amounts in the "Materials" category. Taking all these factors into account, Mr. Sager concluded that a reasonable profit percentage for petitioner's plumbing business would be 11.14 percent of gross revenues.

All other calculations in Mr. Sager's report (with the exception of a few "Statistical Projections" discussed below) depend on this 11.14 percent estimated profit factor. In fact, Mr. Sager's calculations of petitioner's "gross profit" for 1989-92 are nothing more than the gross receipts of petitioner as determined by respondent for each of those years, multiplied by 11.14 percent.

We believe the estimates of petitioner's income based on the "bid sheets" are unreliable for several reasons. Five of the seven bid sheets are undated, and one of the sheets that is dated

bears a date in 1988, a year not in issue.[1]  The job names shown
on five of the seven sheets bear no apparent relation to the
project or account names shown on the copies of checks used to
calculate petitioner's stipulated gross receipts for the years in
issue.  Moreover, there is no evidence that the bid sheets were
ever submitted to, or accepted by, any general contractor.
Therefore, it is not clear that the bid sheets relate to actual
jobs performed by petitioner during the years in issue.

Even if the bid sheets represent any actual jobs, there is
no evidence that the profit factors in the sheets represent the
actual profit realized by petitioner from those jobs.  There is
no evidence that Mr. Sager compared any of the bid sheets with
the financial results of any job.

Finally, even if the bid sheets represented petitioner's
actual profits from actual jobs, there is no evidence that the
sheets represented a reliable sample of the jobs performed by
petitioner during the years in issue.  The sheets--which were
obtained from petitioner--represent only seven jobs; yet Mr.
Sager used them to attempt to estimate 6 years of petitioner's
income.

For all these reasons, we are not persuaded that Mr. Sager's
estimates of petitioner's income based on the bid sheets bear any
relation to the actual amount of profit or taxable income

---

[1] Of course, a job bid for in 1988 could have been performed
in a later year, but there is no evidence of this in the record.

realized by petitioner during any of the years in issue.  We
therefore give those estimates little weight.

    D.  <u>Mr. Sager's "Statistical Projections" and Opinion</u>

    As a check on his estimates of petitioner's income based on
the bid sheets, Mr. Sager consulted four books setting forth
financial ratios for various industries.[2]  Mr. Sager stated that
according to these sources, plumbing businesses with annual sales
of less than $1 million generate net income of approximately 4.2
percent.  On the basis of this information--and his personal
experience providing accounting services to construction
businesses--Mr. Sager expressed the opinion that his estimates of
petitioner's income for 1989-92 based on the bid sheets were
reasonable.  Mr. Sager also opined that the amount of income
determined by respondent for each of the years 1990-92 was
unreasonable.  Mr. Sager testified that in his experience, to
come out of a construction job with a 20-percent profit was
generally extraordinary.

    Mr. Sager did admit that respondent's determination of
petitioner's business net income for 1989 was reasonable.  In
addition, part of Mr. Sager's testimony based on his professional
experience undercuts both his testimony based on the financial
ratios, and his estimates of petitioner's income based on the bid

---

[2] Mr. Sager's report cites Dun & Bradstreet, Industry Norms
and Key Business Ratios (1995); Robert Morris Associates, Annual
Statement Studies 1995; Schonfeld & Associates, IRS Corporate
Financial Ratios (9th ed. 1995); Troy, Almanac of Business and
Industrial Financial Ratios (1996).

sheets.  Mr. Sager testified:  "Typically material costs in most construction jobs range from 30 to 60 percent of your bid.  Most labor costs range from 15 to 35 percent of your bid, and that's pretty--well, that's real broad obviously, but I mean, that is consistent within the market."  As this testimony makes clear, Mr. Sager admitted that material and labor costs combined can vary substantially in the construction business--from 45 percent to 95 percent of the amount bid.

E.  <u>Law and Conclusions</u>

Respondent has determined deficiencies in petitioner's tax for each of the years 1989-92.  Respondent's determinations are presumed correct; petitioner bears the burden of proving that he is entitled to the claimed deductions.  See Rule 142(a).

If a taxpayer has established that deductible expenses were incurred but has not established the amount of such expenses, we may estimate the amount allowable, bearing heavily if we so choose upon the taxpayer whose inexactitude is of his own making.  See <u>Cohan v. Commissioner</u>, 39 F.2d 540, 543-544 (2d Cir. 1930).  However, there must be evidence in the record that provides a rational basis for our estimate.  See <u>Williams v. United States</u>, 245 F.2d 559, 560 (5th Cir. 1957); <u>Vanicek v. Commissioner</u>, 85 T.C. 731, 742-743 (1985).

Expert witness testimony may be appropriate where specialized knowledge can help us understand the evidence or determine a fact in issue.  See Fed. R. Evid. 702.  However, we weigh an expert's testimony in light of his or her

qualifications, as well as all other credible evidence in the record. We are not bound by an expert's opinion. We may accept or reject expert testimony when in our best judgment, based on the record, it is appropriate to do so. While we may choose to accept an expert's opinion in its entirety, we may also be selective in the use of any portion of that opinion. See <u>Seagate Tech., Inc. & Consol. Subs. v. Commissioner</u>, 102 T.C. 149, 186 (1994), and the authorities cited therein.

The only evidence petitioner offered to support his claim that he paid hundreds of thousands of dollars of business expenses in cash in 1989-92 was the report and testimony of Mr. Sager. As we explained, Mr. Sager neither identified any expenses paid by petitioner in cash, nor attempted to calculate petitioner's actual receipts, expenses, or taxable income for any of the years in issue. Instead, Mr. Sager tried to estimate petitioner's income, by deriving a single gross profit percentage (11.14 percent) from a few bid sheets assertedly used by petitioner, and by applying that percentage to petitioner's stipulated gross receipts for each year. Because there is no evidence that the amounts on the bid sheets bear any relation to petitioner's actual receipts, cost, or income from any actual plumbing job during the years in issue, we give the estimates of petitioner's income based on those sheets little weight.

Mr. Sager did try to support his estimates by comparing them to some published financial ratios for the plumbing industry. However, Mr. Sager did not explain how or why the businesses that

generated the information he consulted were comparable to petitioner's business. For this reason we find that the financial ratios have limited relevance to this case. See Kudo v. Commissioner, T.C. Memo. 1998-404; Schachter v. Commissioner, T.C. Memo. 1998-260.

Finally, with respect to Mr. Sager's opinions based on his professional experience, Mr. Sager admitted that a wide range of expenses exists in the construction business.

For all these reasons, we do not accept Mr. Sager's report or testimony in its entirety, and we hold that petitioner has not proved he is entitled to the additional business expense deductions that would be necessary to reduce petitioner's taxable income to the amounts estimated in Mr. Sager's report. However, after having reviewed the entire record, including Mr. Sager's report and testimony, we are convinced that respondent has overstated petitioner's taxable income by at least some amount for each of the years 1990-92.

The parties have stipulated the amounts of petitioner's business gross receipts, noncash business expenses, and unreported net business income (ignoring only any possible cash expenses), for each of the years 1989-92. As a result, the parties have effectively stipulated that petitioner's actual net business income for each of the years 1989-92 cannot be more than the amounts determined by respondent; it can only be less.

The parties have also stipulated that petitioner withdrew substantial amounts of cash from his bank accounts, in each of

the years 1989-92. Respondent, however, has not allowed petitioner _any_ deduction for those years, on account of business expenses paid in cash.

Mr. Sager testified that respondent's determination of petitioner's net business income as 17 percent of gross receipts for 1989 was reasonable. He also testified, however, that respondent's determination of net business income for each of the years 1990-92 was unreasonable and that a profit in excess of 20 percent of gross receipts would be extraordinary. We note that respondent has determined petitioner's net business income to be equal to 41 percent, 43 percent, and 56 percent of gross receipts, for 1990, 1991, and 1992, respectively.

We do not intend to relieve petitioner (or any taxpayer) of the obligation to keep accurate records. However, the evidence (including the stipulated facts concerning petitioner's gross receipts, noncash expenses, and unreported net business income) has convinced us that respondent has overstated petitioner's net business income for, and that petitioner must have paid some business expenses in cash during, each of the years 1990-92.

For this reason, it is appropriate for us to estimate (and allow) at least some amount of cash business expense deductions for each of the years 1990-92, under the rule set forth in Cohan v. Commissioner, supra, as we applied it in Lollis v. Commissioner, T.C. Memo. 1976-15, affd. 595 F.2d 1189 (9th Cir. 1979) (on the basis of accountant's testimony concerning industry financial ratios and the taxpayer's income for several years

subsequent to the years in issue, taxpayer argued that approximately 70 percent of unidentified payments from business checking account were deductible expenses; 40 percent of such payments found deductible under <u>Cohan</u> rule).[3]

Applying the principles set forth in <u>Cohan</u> and in <u>Lollis</u>--and making as close an approximation as we can, bearing down heavily on petitioner--we find that petitioner spent $10,000, $25,000, and $40,000 in cash, on deductible business expenses, in 1990, 1991, and 1992, respectively.  These amounts, when added to the expenses allowed by respondent, will reduce petitioner's net business income to approximately 30 percent of his stipulated gross receipts for each of the years 1990-92, plus the value of the plumbing services petitioner has admitted he performed personally in each of those years.[4]

In all other respects respondent's determinations of deficiencies in petitioner's tax for 1989-92 are sustained.

---

[3] Cf. <u>United States v. Marabelles</u>, 724 F.2d 1374, 1383 (9th Cir. 1984) (<u>Cohan</u> rule inapplicable where a deduction was not denied in its entirety; Commissioner had allowed all expenses claimed on a return, and had given taxpayer the benefit of the doubt with respect to all expenses written on taxpayer's business checking account).

[4] Mr. Sager's report sets forth the value of the plumbing services petitioner told Mr. Sager he performed personally in each year, and adds back those amounts to its estimates of petitioner's profit.  We regard this as an admission by petitioner that his labor costs should be reduced by at least the amounts indicated in Mr. Sager's report.

II. <u>Was Petitioner's Failure To File Returns Fraudulent</u>,
    <u>for Each of the Years 1989-92</u>?

Section 6651(a)(1) provides that in the case of failure to
file a required income tax return when due, unless it is shown
that such failure is due to reasonable cause:

> there shall be added to the amount required to be shown
> as tax on such return 5 percent of the amount of such
> tax if the failure is for not more than 1 month, with
> an additional 5 percent for each additional month * * *
> during which such failure continues, not exceeding 25
> percent in the aggregate;

Section 6651(f) provides that if any failure to file any
income tax return is "fraudulent", section 6651(a)(1) shall be
applied by substituting "15 percent" for "5 percent", and "75
percent" for "25 percent".

In determining whether a failure to file a return is
fraudulent under section 6651(f), we consider the same elements
as we did when considering the imposition of the addition to tax
for fraud under prior law (former section 6653(b)(1)), and as we
do under present section 6663. See H. Rept. 101-247, at 1402-
1403 (1989); <u>Clayton v. Commissioner</u>, 102 T.C. 632, 651-653
(1994). A finding of fraud for any year therefore requires proof
that (1) there was an underpayment of tax for that year, and (2)
at least some part of the underpayment was due to fraud. See
<u>Petzoldt v. Commissioner</u>, 92 T.C. 661, 698-699 (1989).

With respect to the issue of fraud, respondent has the
burden of proof, and must meet that burden with clear and
convincing evidence. See sec. 7454(a); Rule 142(b).

A.  <u>Were There Underpayments of Tax for 1989-92</u>?

Petitioner did not file income tax returns for any of the years 1989-92.  Petitioner has stipulated that he received gross receipts from his plumbing business, in amounts ranging from $234,677 to $476,785 per year, in each of the years 1989-92.  Therefore, it is uncontested that petitioner had substantial unreported receipts from a trade or business, in each of the years 1989-92.

Petitioner has also stipulated that he had unreported net business income, in amounts ranging from $55,812 to $205,270 per year, in each of the years 1989-92, with only one exception:  any possible undocumented business expenses paid with cash or by other nontraceable means.

Petitioner asserts he paid more deductible business expenses than respondent allowed.  We have found that petitioner is entitled to some additional expenses, but there is <u>no</u> evidence that petitioner paid expenses in amounts sufficient to offset his stipulated receipts or net unreported income, in any of the years 1989-92.  Mr. Sager's estimates of petitioner's income based on the bid sheets, and Mr. Sager's estimates based on industry financial ratios--both of which assume petitioner is entitled to far more deductions than we have found--show that petitioner owed tax for each of the years 1989-92.[5]  Therefore, petitioner's own

---

[5] Petitioner's stipulated net business income, additional deductions as found by the Court, and taxes owed as estimated by Mr. Sager (based on the bid sheets) are:

(continued...)

evidence, viewed in the light most favorable to petitioner, shows that petitioner substantially underpaid his tax for each of the years 1989-92.

Finally, petitioner's pleadings and brief admit that petitioner owed taxes for each of the years 1989-92. Nevertheless, no payments or credits were made to petitioner's income tax account for any of the years 1989-92, prior to (or on) the due dates for the returns for those years.

On the basis of these facts and the rest of the record, we hold that respondent has clearly and convincingly proved: (1) There was a substantial underpayment in petitioner's tax for each of the years 1989-92; and (2) there was a substantial "amount required to be shown as tax" (within the meaning of section 6651(a)(1) and (b)(1)) on petitioner's return for each of those years.

B.   Were The Underpayments Due to Fraud--Fraudulent Intent

To prove fraud for any of the years 1989-92, respondent must also prove by clear and convincing evidence that some portion of the underpayment in petitioner's tax for that year was due to fraud. Respondent is not required to prove the precise amount of

---

5(...continued)

| Year | Stipulated Net Income | Additional Deductions | Underpaid Taxes as Estimated by Mr. Sager |
|------|----------------------|----------------------|-------------------------------------------|
| 1989 | $55,812 | -- | $17,438 |
| 1990 | 185,972 | $10,000 | 23,577 |
| 1991 | 205,270 | 25,000 | 23,456 |
| 1992 | 131,415 | 40,000 | 6,014 |

the underpayment resulting from fraud, but only that some part of the underpayment is attributable thereto. See Otsuki v. Commissioner, 53 T.C. 96, 105 (1969).

Fraud is generally defined as intentional wrongdoing on the part of the taxpayer, with the specific purpose of evading tax believed to be owed. See Powell v. Granquist, 252 F.2d 56 (9th Cir. 1958); Mitchell v. Commissioner, 118 F.2d 308, 310 (5th Cir. 1941), revg. and remanding 40 B.T.A. 424 (1939). Negligence of a taxpayer, whether slight or gross, is not sufficient to prove fraud. See Mitchell v. Commissioner, supra at 310. To prove fraud, the Commissioner must show that the taxpayer intended to evade taxes believed to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. See Parks v. Commissioner, 94 T.C. 654, 661 (1990).

The presence of fraud is a question of fact to be resolved upon consideration of the entire record. See Recklitis v. Commissioner, 91 T.C. 874, 909 (1988). Because direct proof of the taxpayer's intent is rarely available, fraud may be proved by circumstantial evidence. See Spies v. United States, 317 U.S. 492 (1943); Recklitis v. Commissioner, supra at 910. Courts have developed a nonexclusive list of the types of circumstantial evidence--often referred to as "badges of fraud"--that will support a finding of fraudulent intent.

In Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601, the Court of Appeals for the Ninth Circuit--to which an appeal of this case would lie--set

forth the following indicia or "badges" of fraud: (1) Understatement of income; (2) maintenance of inadequate records; (3) failure to file tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealment of assets; and (6) failure to cooperate with tax authorities. The Court of Appeals also stated that the existence of the following facts additionally supported a finding of fraudulent intent: (1) Dealing in cash to avoid scrutiny of finances; and (2) failing to make estimated tax payments. See Bradford v. Commissioner at 308.

### 1. Evidence of Fraud--Failure to File Tax Returns

The parties have stipulated that petitioner did not file income tax returns for any of the years in issue (1989-94). The parties have also stipulated that petitioner did not file returns for any of the years 1978-88.

Although the failure to file a return is evidence of fraud, we have often said that without more it is insufficient to prove fraud. This is because a finding of fraud requires proof of some convincing affirmative act or indication of the taxpayer's fraudulent intent. See Bagby v. Commissioner, 102 T.C. 596, 607-608 (1994); Kotmair v. Commissioner, 86 T.C. 1253, 1261 (1986). Other courts have stated the law similarly. See, e.g., Zell v. Commissioner, 763 F.2d 1139, 1143 (10th Cir. 1985), affg. T.C. Memo. 1984-152. However, the failure to file numerous returns over an extended period of time is, under certain circumstances, persuasive evidence of fraud. See Stoltzfus v. United States,

398 F.2d 1002, 1004-1005 (3d Cir. 1968) (convincing affirmative indication of intent to defraud exists where taxpayer repeatedly fails to file and has no reasonable basis for believing that taxes were not owed); Powell v. Granquist, supra at 60-61 (knowingly refusing to file returns for 9 years seen to be of equal persuasiveness in proving fraudulent intent as actually filing false returns).

Because petitioner (1) filed income tax returns for 1973 and 1974; (2) filed "tax protester" returns for 1975 and 1976; (3) contested his 1975 tax liability before this Court; and (4) was convicted in 1980 of willful failure to file for 1976 and 1977, petitioner was undoubtedly aware, with respect to each of the years 1989-92, that he was required to file an income tax return if he had taxable income.  Indeed, petitioner's 1980 letter to the U.S. probation officer acknowledges that the tax laws require individuals to file income tax returns and that they admit of no exception with respect to petitioner.

With respect to petitioner's knowledge of his taxable income for 1989-92, petitioner worked as a plumber and had substantial gross receipts from his plumbing business in each of those years. In addition, petitioner's petition admitted--and petitioner's own witness estimated--that petitioner had substantial taxable income from his business in each of the years 1989-92.  This is compelling evidence that petitioner knew he had taxable income, and was not exempt from the filing requirement, with respect to each of the years 1989-92.

Finally, petitioner has not asserted he was acting under a good-faith belief that his nonfiling for the years in issue was permitted by law. Cf. Cheek v. United States, 498 U.S. 192 (1991). The existence of any such belief is belied by the admissions in his 1980 letter.

The foregoing evidence clearly and convincingly proves that petitioner's failure to file a return for each of the years 1989-92 constituted a willful, intentional violation of a known legal duty. In addition, under the circumstances of this case, petitioner's repeated and prolonged failure to file returns is strong and persuasive evidence that petitioner, by not filing returns for 1989-92, intended fraudulently to evade taxes owed for those years, by concealing his income and assets from the Commissioner. See Stoltzfus v. United States, supra; Powell v. Granquist, supra.

### 2. Other Evidence of Fraud

There is substantial evidence, in addition to petitioner's history of nonfiling, that the underpayments in petitioner's taxes for 1989-92 were due to fraud.

First, petitioner was responsible for the recordkeeping of his plumbing business. In each of the years in issue, petitioner did not maintain, as books and records, invoices, receipts for cash disbursements, a general ledger, a cash receipts journal, or a cash disbursements journal. Taxpayers are required to maintain adequate records. See sec. 6001. Under the circumstances of this case, we find that petitioner's maintenance of inadequate

records is evidence of fraud.  See Bradford v. Commissioner, supra at 307.

Second, during each of the years in issue, petitioner used the same incorrect Social Security number on the invoices he submitted to, and on his contracts with, general contractors for construction projects.  In many circumstances, the use of an incorrect Social Security number could be evidence of nothing more than negligence or mistake.  However, in this case it is clear that petitioner at one time knew his correct number, because he used it on his 1973, 1974, and 1975 returns.  In light of these and the other facts in the record, petitioner's consistent use of an incorrect Social Security number, during a 6-year period, with respect to hundreds of thousands of dollars of business receipts, is relevant evidence of concealment and fraud.

Third, petitioner made extensive use of cash during the years 1989-92.  Dealing in cash may also be evidence of fraud. See Bradford v. Commissioner, supra at 308.

Fourth, as we discuss infra pp. 39-40, it is also clear that petitioner did not pay any estimated taxes for 1989-92.  This is also an indication of fraud.  See Bradford v. Commissioner, supra at 796 F.2d.

3.  Petitioner's Use of a Bahamian Bank Account

We now consider the admissibility of evidence of certain other facts, which respondent claims are circumstantial evidence of fraud.

In 1994 and 1995 four checks of E.A. White Construction Co. (White Co.), payable to petitioner's business Down to Earth Plumbing, in the total amount of $103,274, were deposited (or were sent for deposit) in a bank in Nassau, Bahamas. Petitioner admits that he deposited one of the checks and that he was the owner of the other three checks, which he had received in the ordinary course of his plumbing business.

Petitioner has filed a motion in limine asking us to exclude this evidence of petitioner's use of a Bahamian bank account in 1994 and 1995. Petitioner asserts that his use of a Bahamian bank account in 1994-95 constitutes subsequent "other acts" of petitioner, which are inadmissible "character" evidence under rule 404(b) of the Federal Rules of Evidence. More generally, petitioner asserts that this evidence of petitioner's actions in 1994-95 is unfairly prejudicial, confusing, and cannot be relevant proof of petitioner's intent with respect to his failure to file returns for the years 1989-92.

We agree with petitioner that in order to prove fraud for a particular year, respondent must show that petitioner's failure to file the return for that year was fraudulent. See sec. 6651(f). However, acts committed subsequent to the due date of a return may be relevant evidence of a taxpayer's intent in failing to file that return. See United States v. Farber, 630 F.2d 569, 571-572 (8th Cir. 1980) (tax protester materials filed within 3-½ years after 1974 return due date are admissible to show intent or willfulness in taxpayer's prosecution for failure to file that

return); Bagby v. Commissioner, 102 T.C. 596 (1994) (taxpayer's use in 1991 of forged tax returns and altered checks is relevant evidence of taxpayer's fraudulent intent for tax years 1985-87, where taxpayer had not filed returns for those years).

We also agree with petitioner that under rule 404(a) and (b) of the Federal Rules of Evidence, evidence of petitioner's "other acts" in 1994-95 may not be admitted to prove petitioner's "character" in order to show that petitioner acted in conformity therewith in failing to file returns for 1989-92. However, rule 404(b) of the Federal Rules of Evidence expressly provides that "other acts" evidence may be admitted to show knowledge, intent, or the absence of accident or mistake.

The Court of Appeals for the Ninth Circuit--to which an appeal of this case would lie--construes rule 404(b) of the Federal Rules of Evidence as a "rule of inclusion"; "other acts" evidence is admissible under rule 404(b), unless it tends to prove only propensity or disposition. See United States v. Ayers, 924 F.2d 1468, 1472-1473 (9th Cir. 1991). The Court of Appeals applies the following four-part test to determine the admissibility of "other acts" evidence:

1. sufficient evidence must exist for the trier of fact to find that the party committed the other acts;

2. the other acts must be introduced to prove a material issue in the case;

3. the other acts must not be too remote in time; and

4. if admitted to prove intent, the other acts must be similar to the offense charged. See United States v. Ayers, supra at 1472-1473; United States v. Spillone, 879 F.2d 514, 518-520 (9th Cir. 1989).

The first two parts of this test are obviously satisfied, because the parties have stipulated that the "other acts" occurred, and petitioner's fraudulent intent is clearly material to this case. In our judgment, the other two parts are satisfied as well.

In United States v. Ayers, supra, the taxpayer made incorrect or false declarations to U.S. Customs in Nassau, Bahamas, concerning the amount of cash he was transporting. These declarations were made in 1987. The trial court admitted the declarations as relevant evidence in the prosecution of the taxpayer for conspiracy to defraud the United States and evade taxes, even though the conspiracy had ended in 1985. The Court of Appeals upheld the conviction, reasoning that it was not error to admit the Bahamian declarations under rule 404(b) of the Federal Rules of Evidence. According to the Court of Appeals, the taxpayer's subsequent acts of concealing large amounts of cash were probative of the taxpayer's earlier intent to defraud the United States in the collection of taxes, by concealing his income or net worth. See United States v. Ayers, supra at 1473-1474.

In this case, there is no evidence that petitioner made any false or incorrect statements concerning the Bahamian bank

account.  There is also no evidence that the funds deposited in (or sent to) the Bahamian bank were derived from (or were intended for use in) any illegal activity.  Furthermore, we are aware that the ownership or use by a U.S. person of a foreign bank account, including a Bahamian bank account, is not illegal.

We note, however, that the checks deposited in (or sent to) the Bahamian bank were White Co. checks, payable to petitioner's plumbing business.  Several of the checks respondent used to reconstruct petitioner's stipulated gross receipts in 1991 and 1992 were also White Co. checks, and the parties have stipulated that for the years 1989-92, petitioner received payments for services from White Co. totaling $183,285.  Moreover, during each of the years 1989-92, petitioner used the same incorrect Social Security number on the invoices he submitted to, and on his contracts with, general contractors for construction projects.  Finally, the stipulated use of the Bahamian bank account occurred after the Commissioner's Criminal Investigation Division had notified petitioner that it was investigating petitioner's tax liability for 1989-92.

In light of these and all other facts in the record, we hold that the stipulated facts concerning petitioner's use of the Bahamian bank account are admissible, relevant, probative evidence of petitioner's intent (in failing to file tax returns for 1989-92) to conceal income or assets (including moneys received from White Co.) earned or owned during 1989-92, and thereby evade the payment of taxes believed to be owed for those

years. We also believe the probative value of this evidence is not outweighed by the danger of unfair prejudice or confusion. We guard against any such danger by considering the evidence only for the purpose of determining petitioner's intent, and by reminding ourselves that there is no evidence that petitioner's use of the Bahamian bank account was itself illegal.

### 4. Effect of Petitioner's Failure To Testify

Petitioner did not testify at trial, or otherwise offer an explanation of his failure to file. On brief, petitioner attributes these omissions to his unwillingness to waive his Fifth Amendment right against self-incrimination. Petitioner therefore asserts that we may not draw any adverse inference from his silence.

As an initial matter, we note that because petitioner did not appear at trial, petitioner did not actually claim the Fifth Amendment privilege. Therefore, we did not have the opportunity to consider whether petitioner would have been entitled to assert the privilege, either generally or in response to specific questions. Nevertheless, because respondent did at one time conduct a criminal investigation of petitioner with respect to some of the years in issue, we will give petitioner the benefit of the doubt and assume he validly asserted the Fifth Amendment privilege.

Petitioner is of course correct that a prosecutor may not comment on, or tell a jury that it may draw an adverse inference from, a defendant's Fifth Amendment silence in a criminal case.

See Griffin v. California, 380 U.S. 609 (1965).  However, the Supreme Court has clearly stated that a trier of fact in a civil proceeding may hold a party's silence against him.  See Baxter v. Palmigiano, 425 U.S. 308 (1976).  The trier of fact may not reach a decision adverse to the civil party solely by reason of the party's silence, because that would make the assertion of the Fifth Amendment privilege impermissibly costly.  However, the trier may take the party's silence into account along with the other evidence in the case.  See Baxter v. Palmigiano, supra at 316-320; LaSalle Bank Lake View v. Seguban, 54 F.3d 387, 389-391 (7th Cir. 1995) (silence is a relevant factor to be considered in light of the proffered evidence, but the direct inference of guilt from silence is forbidden).

The civil fraud addition to tax is neither punishment nor a criminal penalty.  See Helvering v. Mitchell, 303 U.S. 391 (1938); Ianniello v. Commissioner, 98 T.C. 165 (1992) (civil fraud addition not punishment).  Therefore, we are permitted to draw an adverse inference from a taxpayer's silence in deciding whether the fraud penalty applies.  See Petzoldt v. Commissioner, 92 T.C. 661, 683-686 (1989).

In this case, we take petitioner's silence into account, as a factor to be considered in combination with all the other evidence in the record, in confirming our decision that petitioner is liable for the fraud additions for 1989-92.

C.  Holding on the Fraud Additions

We find that the evidence clearly and convincingly proves that petitioner's failure to file an income tax return for each of the years 1989-92 was fraudulent within the meaning of section 6651(f).  Respondent's determination that the 75-percent fraud addition under section 6651(a) and (f) applies to each of the years 1989-92 is sustained.

III.  Should Respondent's Determinations of Petitioner's Unreported Income for 1993 and 1994 Be Sustained?

Respondent did not use the "specific items" method to reconstruct petitioner's income for 1993 and 1994.  Instead, respondent determined petitioner's income by reference to average cost-of-living survey information obtained from the Bureau of Labor Statistics (BLS).  Using tables that classify the BLS statistics according to age, size of consumer unit, occupation, and location, respondent determined that petitioner had a cost of living--and therefore must have had net business income--of $34,533 and $35,638, in 1993 and 1994 respectively.

We sustain respondent's determinations of deficiencies in petitioner's tax for 1993 and 1994, for the following reasons.

A.  Reasonable Use of BLS Statistics

In certain circumstances, the Commissioner may use cost of living statistics, including BLS survey information, to reconstruct a taxpayer's income.  See Giddio v. Commissioner, 54 T.C. 1530 (1970);  Bennett v. Commissioner, T.C. Memo. 1998-96.  As we stated in Giddio v. Commissioner, supra at 1533:

> Where * * * there is evidence of taxable income but no information can be acquired to ascertain the amount of such income, we do not think it is arbitrary for the Commissioner to determine that the taxpayer had income at least equal to the normal cost of supporting his family. * * *

The parties have made the following stipulations concerning petitioner's income for 1993 and 1994:

1. Petitioner earned gross income from his plumbing business in 1993 and 1994.

2. In the course of his plumbing business, petitioner received payments from White Co. in 1993 and 1994, in amounts totaling $48,504 and $46,000, respectively.

3. In 1993, petitioner lent $200,000 to White Co., and received interest income from White Co. in the amount of $20,558.

In addition, petitioner's pleadings admit that petitioner owed tax for both 1993 and 1994.

The parties have also stipulated as follows concerning respondent's lack of information about the amount of petitioner's taxable income for 1993-94:

1. Petitioner did not file a tax return for 1993 or 1994.

2. Respondent has no documentation concerning petitioner's business expenses for 1993 and 1994.

3. Petitioner did not maintain, as books and records for 1993 or 1994, invoices, receipts for cash disbursements, a general ledger, a cash receipts journal, or a cash disbursements journal.

4.  Petitioner did not produce any business or accounting records for respondent to examine, with respect to 1993 or 1994.

Under these circumstances, we find that respondent's reconstruction of petitioner's income by reference to the BLS information was reasonable.  It is uncontested that petitioner received unreported business gross receipts and interest in 1993 and 1994, in amounts substantially in excess of the unreported income determined by respondent for those years using the BLS method.  Also, petitioner's petition admitted that petitioner owed tax for 1993 and 1994.  Therefore, there is ample evidence that petitioner had taxable income in 1993-94, other than the purely circumstantial proof provided by the cost of living data.  It is also clear that respondent lacked the information necessary to ascertain the amount of that income.

B.  Petitioner's Asserted Deductions for 1993-94

Petitioner asserts that he paid substantial business expenses in 1993-94, and that his taxable income for each of those years was therefore less than the income determined by respondent using the BLS method.  We find that petitioner is not entitled to any reduction in the amount of taxable income determined by respondent for 1993 or 1994, for two reasons. First, the BLS method used by respondent is based on petitioner's assumed cost of living; it is therefore an estimate of petitioner's net business income, and has already taken business deductions into account.  Second, as noted above, petitioner received business gross receipts and interest in 1993 and 1994,

in amounts substantially in excess of the unreported taxable income determined by respondent for those years, and petitioner has not proved that he is entitled to any business expense deductions from that unreported income.

With respect to 1993 and 1994 as well, petitioner's only evidence concerning business expenses was the report and testimony of Mr. Sager. The data and methodology underlying Mr. Sager's estimates of petitioner's taxable income for 1993-94 are almost identical to the data and methodology underlying Mr. Sager's estimates of petitioner's taxable income for 1989-92. We therefore give Mr. Sager's estimates for 1993-94 little weight, for the reasons set forth in our discussion of the deficiencies for 1989-92.

We also note that Mr. Sager's testimony with respect to 1993-94 differed from his testimony with respect to 1989-92. On the basis of his professional experience and the financial reference books he consulted, Mr. Sager testified that respondent's determinations of petitioner's taxable income for 1990-92 were unreasonable. By contrast, Mr. Sager did not opine that respondent's determinations for 1993 and 1994 were unreasonable.

Finally, although the parties have stipulated that petitioner had some gross receipts for 1993 and 1994, they have not stipulated petitioner's total gross receipts for either of those years. Petitioner's actual gross receipts and actual taxable income for 1993 and 1994 may have been greater than the

amounts determined by respondent, even if petitioner paid substantial deductible business expenses in those years.[6] Therefore, even if petitioner's evidence had convinced us that he had paid substantial business expenses in 1993-94, the conditions for applying the Cohan rule for those years would not be satisfied.  See Norgaard v. Commissioner, T.C. Memo. 1989-390, affd. on this issue and revd. in part 939 F.2d 874 (9th Cir. 1991) (Cohan rule not applicable to estimate gambling losses where taxpayer had not established his actual gambling gross receipts).

For all these reasons, we find that petitioner is not entitled to any additional deductions for 1993 and 1994; respondent's deficiency determinations for those years are sustained.

## IV.  Does the Section 6651(a)(1) Addition Apply for 1994?

Section 6651(a)(1) imposes an addition to tax for the failure to file an income tax return within the time prescribed by law, unless it is shown that the failure is due to reasonable cause.  A failure to file is due to reasonable cause if the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time.  See sec. 301.6651-1(c)(1), Proced. & Admin. Regs.  The taxpayer bears the burden of showing that the failure was due to

---

[6] This could not have been the case for 1989-92, because the parties stipulated that petitioner's total business gross receipts for each of those years were equal to the amounts determined by respondent.

reasonable cause.  See Rule 142(a); <u>United States v. Boyle</u>, 469 U.S. 241, 245 (1985).

The parties have stipulated that petitioner did not file an income tax return for 1994.  Respondent has determined that petitioner did not have reasonable cause for his failure to file.

Having sustained respondent's determination that there was a deficiency in petitioner's tax for 1994, we find that petitioner was required to file a 1994 return and that he did not do so.

Petitioner did not argue or offer any evidence suggesting that he had reasonable cause for his failure to file a 1994 return.  Petitioner's arguments and evidence challenged only the amount of the deficiency determined by respondent; petitioner did not attempt to establish that he had cause for his failure to file.  Accordingly, we find that petitioner has not shown that his failure to file a 1994 return was due to reasonable cause and not to willful neglect.  We therefore sustain respondent's determination of the section 6651(a)(1) addition for 1994.

V.    <u>Estimated Tax Additions for 1989-94</u>

Respondent also determined that petitioner is liable for additions to tax under section 6654(a), for failure to pay estimated tax in each of the years 1989-94.  Section 6654(a) provides for an addition to tax in the case of any underpayment of estimated tax by an individual.  The addition to tax under section 6654 is mandatory absent a showing by the taxpayer that one of the statutory exceptions applies.  See <u>Clayton v. Commissioner</u>, 102 T.C. at 653.

We have already sustained respondent's deficiency determinations for the years 1989, 1993, and 1994.  We have found that petitioner is entitled to some additional business expense deductions for 1990, 1991, and 1992.  However, we have otherwise sustained respondent's deficiency determinations, and have found that petitioner still owed substantial amounts of tax, for each of those years.

We have found that no payments or credits were made to petitioner's income tax account for any of the years 1989-94, prior to 1996.  Therefore, we also find that no required installments of estimated tax were paid for those years.  Petitioner neither argued nor offered evidence suggesting that any of the statutory exceptions to the estimated tax additions apply, or that respondent's determination of petitioner's liability for those additions is in error.

Accordingly, we sustain respondent's determinations of the additions to petitioner's tax under section 6654(a), for each of the years 1989-94, except to the extent such determinations must be adjusted to take account of the additional deductions we have found for 1990-92.

To reflect all the foregoing,

<u>An order will be issued denying petitioner's motion in limine, and decision will be entered under Rule 155</u>.