T.C. Memo. 2017-168

UNITED STATES TAX COURT

STEVEN MILEHAM, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 16728-14.                    Filed August 28, 2017.

<u>David Richard Reid</u> and <u>George Edward Marifian</u>, for petitioner.

<u>Stephen A. Haller</u> and <u>Karen O. Myrick</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

BUCH, <u>Judge</u>:  Steven Mileham is a numismatist; he buys and sells coins and precious metals.  During 2009 through 2011, the years in issue, Mr. Mileham engaged in thousands of transactions in which he purchased and sold coins and precious metals.  In some of these transactions Mr. Mileham accepted coins and precious metals as payment for his sales; in other words, Mr. Mileham engaged in

[*2] exchange transactions. In those exchange transactions Mr. Mileham prepared handwritten split invoices that show both purchases and sales. Although many of his split invoices were incomplete, Mr. Mileham used them to prepare his returns.

The Commissioner examined Mr. Mileham's 2009 through 2011 returns. In examining his books and records the Commissioner did not find many of the split invoices to be credible. Instead, the Commissioner determined Mr. Mileham's costs of goods sold by totaling distributions from his bank accounts, effectively disregarding purchases made through exchange transactions. At the same time, the Commissioner accepted the gross receipts as reported, which included sales from exchange transactions. The Commissioner issued a notice of deficiency for 2009 through 2011, reducing Mr. Mileham's costs of goods sold by $10,462,311, $27,707,196, and $578,738 for 2009, 2010, and 2011, respectively. The Commissioner also determined that Mr. Mileham is liable for a section 6651(a)(1) addition to tax and a section 6662(a) accuracy-related penalty for each year.[1] The Commissioner's determination is as follows:

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the relevant years, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[*3]

| Year | Deficiency | Addition to tax sec. 6651(a)(1) | Penalty sec. 6662(a) |
|---|---|---|---|
| 2009 | $3,885,469 | $971,267.25 | $777,094.80 |
| 2010 | 10,304,497 | 2,059,218.20 | 2,060,899.40 |
| 2011 | 211,827 | 12,516.80 | 42,365.40 |

After concessions by both parties, we must decide whether Mr. Mileham (1) had higher costs of goods sold than the Commissioner determined for 2009 and 2010; (2) is liable for a section 6651(a)(1) addition to tax for 2009; (3) is liable for section 6662(a) accuracy-related penalties for 2009 and 2010; and (4) is entitled to fees and costs under section 7430.

On the basis of the evidence presented at trial, we hold that Mr. Mileham did not substantiate his costs of goods sold. However, there is sufficient evidence for the Court to estimate his costs of goods sold using his markup over cost. We hold that Mr. Mileham's markup over cost is 2.19%. Mr. Mileham stipulated that he failed to timely file his 2009 return; therefore, the Commissioner has met his burden of production for a section 6651(a)(1) addition to tax. Mr. Mileham has not established that his untimely filing was due to reasonable cause and not due to willful neglect. We hold that the Commissioner has met his burden of production for the section 6662(a) accuracy-related penalties for underpayments due to

**[*4]** negligence because Mr. Mileham failed to maintain adequate books and records, and he may have met his burden of production for accuracy-related penalties due to substantial understatements of income tax, depending on the Rule 155 computations. Mr. Mileham has not established that he had reasonable cause and acted in good faith with respect to any portion of the underpayment for 2009 or 2010. Finally, Mr. Mileham's request for administrative and litigation costs under section 7430 is premature.

FINDINGS OF FACT

Each year Mr. Mileham engages in thousands of transactions in which he buys and sells bullion, numismatic coins, scrap metals, jewelry, stamps, and other collectibles. He operates principally out of Springfield, Illinois.

I.    Mr. Mileham's Coin and Precious Metals Businesses

Mr. Mileham began working in the coin and precious metals industry in the 1960s. He began by working for his father, a coin dealer. They worked together for approximately 20 years until Mr. Mileham left to join another coin and precious metals business.

In 1989 Mr. Mileham began his own coin and precious metals business as a sole proprietorship under the name Goldlink. Initially, Mr. Mileham operated exclusively as a wholesaler. In 1996 Mr. Mileham opened a storefront in

**[\*5]** Springfield, Illinois, where he could buy from and sell to customers. His store also provided him a place to sort, process, and store his coins and precious metals.

Mr. Mileham also was a shareholder in other coin businesses. During 2009 and 2010 Mr. Mileham was a 50% shareholder in a coin dealership named Equity One Enterprises. Equity One Enterprises was organized as an S corporation. In 2011 Mr. Mileham became a 50% shareholder in a pawn shop named Monster Pawn Shop Springfield. Monster Pawn is also an S corporation.

A.    Mr. Mileham's Transactions

During the years in issue Mr. Mileham primarily engaged in transactions with wholesalers and large-volume customers; however, he also engaged in transactions with refiners and individuals.

His transactions can be broken down into four categories: purchases, sales, commissions, and exchanges.

The first type of transaction that Mr. Mileham engaged in is an outright purchase. In this type of transaction he typically purchased scrap metals, finished products, and numismatic coins in varying quantities from refiners, wholesalers, and individuals. To purchase these materials Mr. Mileham spent most of his weeks traveling to different venues throughout the Midwest. He visited between 3

[*6] and 12 different wholesalers on each trip and had transactions that ranged between $10,000 and $50,000 per store. On these trips he also purchased materials that he needed to cover sales to other customers.

The second type of transaction that Mr. Mileham engaged in is an outright sale. In this type of transaction he sold numismatic coins, finished goods, and scrap metals to wholesalers, individuals, and retailers. He sold his items in various ways. One way he conducted sales was at his store. He spent a few days a week at his store, and he engaged in roughly 3 to 10 transactions per day with customers. When not tending to customers, he made additional sales over the phone, through fax, or by email. He also sold his items at trade shows. Mr. Mileham attended 15 one-day events and 8 to 9 multiday events annually. During the trade shows Mr. Mileham had multiple sales occurring at the same time, and he sold his items to the public and to dealers.

The third type of transaction that Mr. Mileham engaged in is facilitating a transaction between third parties, in which case he received a commission. This scenario arose in one of two ways. In one instance, the purchaser would directly pay the seller, the seller would ship the goods directly to the purchaser, and Mr. Mileham would receive a commission for facilitating the transaction. Alternatively, Mr. Mileham would receive an advance from a purchaser and

[*7] acquire the item for the purchaser. Mr. Mileham would pay the seller for the item but retain a portion of the purchase price as his commission.

The final type of transaction that Mr. Mileham engaged in, the center of this controversy, is an exchange transaction. Mr. Mileham frequently engaged in exchange transactions, in which he sold and purchased items in the same transaction. Because the parties' purchased and sold items were rarely (if ever) equivalent in value, the party who received additional value would pay the difference.

A series typical of Mr. Mileham's exchange transactions can be seen in the following example: Mr. Mileham would exchange finished products that he had on hand (or he would purchase finish products to cover the shortage from his inventory) for a customer's scrap metals. Once Mr. Mileham had accumulated enough scrap metals, he would take them to a refiner and exchange them for finished products. Now again having finished products Mr. Mileham would exchange his finished products for more scrap metal.

B. Payment

Mr. Mileham accepted both cash and noncash payments, including cash, PayPal, checks, wire transfers, gold and silver bullion, and jewelry. Not every cash transaction went through Mr. Mileham's accounts.

**[*8]** II.      <u>Pricing of Purchases and Sales</u>

Mr. Mileham used a variety of factors to determine purchase prices and sale prices, each factor depending in part on the market.

For each transaction Mr. Mileham noted the spot price.[2]  Because the prices fluctuated continuously, Mr. Mileham received periodicals, newsletters, and emails to stay current on the market prices.  He received a daily email from market makers with a comprehensive list of items that included the bid price and the ask price.  Mr. Mileham typically tried to purchase an item for 1% below the spot price.  And if he sold the item he would try to do so at 1% above that spot price.  However, he had to make adjustments.  He could not always buy an item below the spot price; items such as Krugerrand gold coins were difficult to purchase below the spot price.

Mr. Mileham adjusted his price to account for competition.  Because Mr. Mileham knew that a customer would purchase from or sell to a competitor with more attractive pricing, he tried to arrange for pricing close to that of his competitors.

---

[2]Black's Law Dictionary 1381, 1621 (10th ed. 2014) defines "spot price" as "[t]he amount for which a commodity is sold in a spot market."

**[*9]**  Mr. Mileham adjusted his price according to the availability of items.  If a customer wanted to purchase an item that Mr. Mileham did not have in inventory then Mr. Mileham had to purchase that item to cover the sale and mark it up from his purchase price.  Sometimes he had to buy items at or above the spot price to fill orders.

Finally, Mr. Mileham had to adjust his pricing according to how long he had items in his inventory.  Mr. Mileham needed to turn over his materials quickly to offset major price fluctuations and to purchase more materials.  If Mr. Mileham bought an item on one day and the next day the spot price changed, his markup over cost changed, which meant that he sometimes sold items at a loss.  To minimize the effects of these fluctuations, Mr. Mileham sold items quickly.

III.    Markup Over Cost

Mr. Mileham generally understands his markup over cost because he runs his business and sets the prices for which he purchased and sold items.

Mr. Mileham aims for a different markup over cost for different types of items.  He targets a 1% markup over cost for large scrap metals and silver and a 0.5% markup over cost for gold.  Although it depends on the item, Mr. Mileham estimates his overall markup over cost to be 1% to 2%.

**[\*10]** The parties presented evidence of Mr. Mileham's specific purchases and sales during the years in issue. This evidence shows that Mr. Mileham occasionally purchased and sold the same item on the same day. The Court identified 47 transactions where he bought and sold the same items on the same day.

For instance, on February 13, 2009, Mr. Mileham purchased and sold an item described as "1803 $1 PF 64". He purchased from an individual an item that he described as "1803 $1 PF 64" for $3,975. That same day he sold to Mid America, a dealer, an item that he described as "1803 $1 PF 64" for $4,000. Although Mr. Mileham did not testify to this specific type of item, the written descriptions on the invoices are identical. This is a $25 markup on the item or a 0.63% markup over his cost.

On June 5, 2009, Mr. Mileham purchased and sold American Silver Eagle coins. Mr. Mileham abbreviated American Silver Eagle coins as ASE. According to his invoices, he purchased from Scotsman Coin and Jewelry (Scotsman), a wholesaler, 500 "Silver Eagle B.U. 2009" for $17.07 each. That same day he sold "2009 ASE" for $17.30. This is a 23 cent markup per American Silver Eagle coin or a 1.35% markup over cost.

[*11] On July 17, 2009, Mr. Mileham purchased and sold 10kt gold in grams. Although Mr. Mileham did not often specify the units of karat gold, when he did, it was by the gram. He purchased 155.9 grams of 10kt gold for $17.70 per gram. That same day he sold 4.2 grams of 10kt gold for $17.72 per gram. This is a 2 cent markup per gram or a 0.11% markup over cost.

Also on July 17, 2009, Mr. Mileham purchased and sold 14kt gold. He purchased 120.3 grams of 14kt gold from AB for $24.80. That same day he sold to RCG 9.5 grams of 14kt gold for $24.85 per gram. This is a 5 cent markup per gram or a 0.2% markup over cost.

On August 10, 2009, Mr. Mileham purchased and sold 1 oz proof American Gold Eagle coins. Mr. Mileham abbreviates American Gold Eagle as AGE. He purchased from University Coin, Stamp & Jewelry two "1 oz Proof AE gold in box" for $1,500 each. That same day he sold to an individual 3.85 oz of "AGE PR" for $1,550 each. This is a $50 markup per 1 oz proof American Gold Eagle or a 3.33% markup over cost.

On December 14, 2010, Mr. Mileham purchased and sold 2010 silver proof sets. He purchased from the U.S. Mint 30 "2010 Silver Proof Set[s]" for $54.10 each. That same day he sold to an individual 5 "2010 Pr set silver" for $56 each. This is a $1.90 markup per 2010 silver proof set or a 3.51% markup over cost.

[*12] The median markup over cost in the 47 pairs of same-day transactions is 2.19%.

IV.    The Coin and Precious Metals Industry

At trial Mr. Mileham called Jason Schulz and Clay Teague as dual fact and expert witnesses on the coin and precious metals industry, pricing factors, and markups over cost.

Mr. Schulz has worked in the coin and precious metals industry for 10 years.  He is a sales manager for Midwest Money, a coin and precious metals wholesaler that occasionally sells some of its items at retail.  He handles sales, purchases, and exchanges for precious metals.  Midwest Money and Mr. Schulz have been doing business with Mr. Mileham for as long as Mr. Schulz can remember.

Mr. Teague has worked in the coin and precious metals industry for over 20 years.  Mr. Teague is an office manager for Scotsman, where he handles purchases and sales.  Scotsman is a coin and precious metals wholesaler that occasionally sells some of its items at retail.  Scotsman and Mr. Teague have done business with Mr. Mileham.

**[\*13]**  The Court recognized Mr. Schulz and Mr. Teague as experts in the coin and precious metals industry.[3]

A.  Industry

Mr. Mileham called Mr. Schulz and Mr. Teague to explain the coin and precious metals industry.  They testified that it is a competitive, high-volume, low-margin industry.  Mr. Teague explained that the general business model is to make a profit on small markups over cost over time.

Mr. Schulz discussed the coin and precious metals market during the years in issue.  He explained that the market prices fluctuated daily for coins and precious metals.  In 2009 and 2010 the market prices for silver and gold stayed relatively constant, but the market prices increased significantly in 2011.

Mr. Teague presented evidence as to the turnover rate for items.  He explained that items are typically purchased and resold from wholesaler to wholesaler and then from wholesaler to dealer.  In his expert report Mr. Teague submitted 69 of Scotsman's invoices to show his transactions with Mr. Mileham.  Thirty-one of those transactions included the previous purchase or subsequent sale

---

[3]The Court granted Mr. Mileham's motion to allow Mr. Schulz to testify without an expert report.

[*14] of the same items.  Most of these transactions happened on the same day, and all of the transactions happened in under a week.

### B.    Pricing Strategy

Mr. Schulz testified as to his pricing strategy, and Mr. Teague testified as to additional pricing factors.  Mr. Schulz explained that he looks at the spot price.  For example, if the spot price per bullion bar was $1,000, he would sell the bullion bar for $1,020.

Both witnesses explained that they adjust their pricing according to the competition.  They explained that the competitiveness of the industry prevents wholesalers from marking items too high because the customer will purchase from another seller.  Mr. Schulz explained that given the competitiveness of the industry, the wholesalers know each others' markups.  Likewise, Mr. Teague testified that high markups would not sustain a business.

Mr. Schulz also explained how the availability of items affects pricing.  Mr. Schulz explained that if he needed an item and did not have it on hand, he would purchase the item above the spot price to cover the sale.  For example, if the spot price per gold bar was $1,200 and he did not have it on hand, he would purchase it for $1,230.  He would then retail it to a customer for $1,250.  This is a $20 markup or a 1.63% markup over cost.

**[*15]** C.  Markups

Mr. Schulz and Mr. Teague testified regarding their respective markups. Mr. Schulz testified that he aims for a 1% to 2% markup over the cost for gold and silver.  Mr. Teague testified that his wholesaler transactions typically have a 0.5% to 2% markup over cost.  In his expert report Mr. Teague included a list of transactions Scotsman had with Mr. Mileham where Scotsman purchased and sold the same items.  The median markup over cost in these transactions was 0.29%.

D.  Opinions as to Mr. Mileham's Markup Over Cost

The experts opined as to Mr. Mileham's markup over cost.  Mr. Schulz opined that Mr. Mileham's markup was roughly 1% to 2% but was closer to 1% because of competition.  Although Mr. Schulz was not familiar with the exact purchase price of Mr. Mileham's items, he based his opinion on his familiarity with Mr. Mileham's business.

Mr. Teague opined that Mr. Mileham's markup over cost on wholesale sales was between 0.5% and 2%.  He further opined that the competitiveness of the wholesale market would not support a 5% markup over cost.  He stated his opinion on the basis of his experience in the industry and his familiarity with Mr. Mileham's business.

**[*16]** V.    Recordkeeping Procedures

Mr. Mileham is solely responsible for preparing and maintaining his records and invoices. He established a system of accounting for each transaction. He reported his transactions using the cash basis method of accounting.

A.    Split Invoices

Mr. Mileham tried to track each transaction using a split invoice. A split invoice allows him to account for his exchange transactions through separate columns for purchases and sales. At the top of each split invoice is a unique invoice number. Underneath the invoice number are lines for Mr. Mileham to record the name and address of the other party to the transaction. The split invoice is divided into two columns, with one column for purchases and the other for sales. Each column has a space for the number of items, their descriptions, and their values. At the bottom Mr. Mileham can total and offset the two columns to arrive at a net amount, whether net purchase or net sale. The split invoice has lines for Mr. Mileham to record whether the transaction was paid by check or cash if a net sale. The split invoice, however, does not include a line to record the date.

Mr. Mileham left many split invoices incomplete. On many invoices he omitted the date. On others he omitted the name of the other party to the transaction. He often omitted the descriptions and number of items purchased or

[*17] sold. And he often omitted the purchase amount, the total amount of the gross purchase or gross sale, and the method of payment.

Mr. Mileham did not keep his split invoices organized. Although they were prenumbered, he grabbed them in stacks and carried them in his briefcase. He grabbed random invoices from his briefcase and occasionally dropped them off in a tray at his store. At various times Mr. Mileham took the split invoices from the tray to his house to store them in a box according to the year. At trial Mr. Mileham was unsure which invoices related to which year.

### B. Other Recordkeeping Procedures

There are various common recordkeeping procedures that Mr. Mileham did not adopt. Mr. Mileham did not keep a formal accounting system or hire a bookkeeper. He did not have an electronic recordkeeping system. He did not keep accounting records of his inventory. He did not keep a ledger of cash transactions. He did not keep third-party invoices. And he did not keep an itemized list of the inventory he sold for any given year.

## VI. Return Preparation and Returns

Mr. Mileham has retained the same return preparer, James Blackburn, for almost 30 years. Mr. Blackburn prepares and files Mr. Mileham's Forms 1040, U.S. Individual Income Tax Return.

**[*18]** A.     Mr. Mileham's Process for Preparing Returns

Over the years Mr. Mileham and Mr. Blackburn developed a system for preparing his returns.  Mr. Mileham prepared a one-to-two page yearend summary for his sales, purchases, and expenses.  To prepare his yearend summaries, Mr. Mileham had part-time employees compile and total his split invoices and third-party receipts.  Once the totals were calculated, he verified that number against his bank statements.

Mr. Mileham provided the yearend summary to Mr. Blackburn along with his Schedules K-1, Partner's Share of Income, Deduction, Credits, etc.  Mr. Blackburn did not review Mr. Mileham's bank statements or split invoices.

Once Mr. Blackburn received the documents, he transferred the raw numbers from the summaries and from the Schedules K-1 onto the returns.  Mr. Blackburn electronically filed Mr. Mileham's returns.  However, he would not file Mr. Mileham's returns until he received all the necessary information because as he understood the law, he could not "fill out a[n] incomplete and a fraudulent return and then sign it under perjury".  After a return was filed, Mr. Blackburn would return the yearend summary sheets and Schedules K-1 to Mr. Mileham.

**[*19]** B.     Mr. Mileham's 2009 Return

Mr. Mileham's 2009 return was due to be filed on or before April 15, 2010. Mr. Mileham requested an automatic extension, and his return became due on or before October 15, 2010. During the time of the extension Mr. Mileham awaited his Schedule K-1 from Equity One Enterprises. The certified public accountant (C.P.A.) for Equity One Enterprises signed a Form 1120S, U.S. Income Tax Return for an S Corporation, for 2009 on September 9, 2010. On the same day the C.P.A. addressed a letter to Mr. Mileham stating that he had enclosed Mr. Mileham's Schedule K-1. Mr. Blackburn did not receive the Schedule K-1 in time to prepare and timely file Mr. Mileham's 2009 return.

Mr. Mileham filed his 2009 return on April 29, 2011, over six months after the return was due after taking extensions into account. He included a Schedule C, Profit or Loss From Business, for his business on which he reported gross receipts of $40,285,010 and cost of goods sold of $40,091,860. He reported total gross income of $193,150, equaling a 0.48% markup over cost. After expenses Mr. Mileham reported a net profit of $49,500. He reported income from an S corporation of $3,113.

**[*20]** C.     Mr. Mileham's 2010 Return

Mr. Mileham's 2010 return was due to be filed with extensions on or before October 15, 2011.  Mr. Mileham filed his return on February 1, 2012.  Mr. Mileham included a Schedule C for his business on which he reported gross receipts of $48,035,009 and cost of goods sold of $47,853,255.  He reported total gross income of $181,792, equaling a 0.38% markup over cost.  After expenses Mr. Mileham reported a net profit of $47,854.

D.     Mr. Mileham's 2011 Return

Mr. Mileham's 2011 return was due to be filed with extensions on or before October 15, 2012.  Mr. Mileham filed his return on November 14, 2012.  Mr. Mileham included a Schedule C for his business.  On which he reported gross receipts of $32,673,912 and cost of goods sold of $32,311,053.  He reported total gross income of $362,859, equaling a 1.12% markup over cost.  After expenses Mr. Mileham reported a net profit of $239,143.

VII.   Record Retention and Third-Party Access to Records

Mr. Mileham often provided third parties access to his records.  Mr. Mileham provided the Federal Bureau of Investigation access to his records regarding one of his clients.  He also allowed police officers access to his records as part of their investigations of potentially stolen goods.  Mr. Mileham allowed

[*21] employees of other businesses access to his records upon request. When Mr. Mileham provided the parties access to his records, he gave them the original documents and did not make copies. Although he believes that all of his records were returned, he is unsure.

VIII. Examination of Mr. Mileham's Returns

The Commissioner selected Mr. Mileham's 2009 through 2011 returns for examination.

The revenue agent assigned to the case requested books and records from Mr. Mileham. Initially, Mr. Mileham did not provide the revenue agent with all of his documents. Mr. Mileham provided boxes containing his unorganized split invoices and third-party invoices sorted by year. He also provided his yearend summaries. He believes that he provided every invoice that he had to the revenue agent.

The revenue agent also requested Mr. Mileham's bank statements, but Mr. Mileham did not provide his bank statements. Instead, he asked that the revenue agent issue a summons to obtain his complete records directly from the bank. The revenue agent summoned Mr. Mileham's bank statements for his various accounts.

The revenue agent and Mr. Mileham discussed Mr. Mileham's returns. They discussed how Mr. Mileham prepared his returns, and Mr. Mileham

[*22] explained that he prepared his returns by checking his yearend summaries against his bank statements. Although Mr. Mileham explained to the revenue agent that he engaged in exchange transactions and showed him the split invoices that detailed his exchange transactions, the revenue agent believed Mr. Mileham told him that he did not use his split invoices in preparing his returns.

The revenue agent reviewed and prepared a spreadsheet of Mr. Mileham's split invoices listing the date, invoice number, gross purchase, and gross sale. With respect to the purchases he also indicated whether each purchase was paid for in cash, by check, by an advance, or through an exchange transaction. The revenue agent recorded approximately one-fifth of the dated invoices for 2009 and 2010. In doing so, the revenue agent decided that many of the split invoices were not credible because they were undated.

The revenue agent reviewed Mr. Mileham's bank statements. He examined all of the payments from Mr. Mileham's bank and PayPal accounts. For each withdrawal the revenue agent listed, among other things, the date, amount, and check number and whether the withdrawal was a possible cost of goods sold.[4] He

---

[4]The revenue agent also performed a bank deposits analysis on Mr. Mileham's accounts for the years in issue. The gross receipts amount calculated in the bank deposits analysis was lower for each year than that reported on Mr. Mileham's return.

[*23] totaled the possible cost of goods sold from each account to arrive at a total cost of goods sold.

The revenue agent did some research into the coin and precious metals industry. At trial the Court asked the revenue agent:

> THE COURT: Did you familiarize yourself in any way, shape or form with Mr. Mileham's business as part of your audit? Let's start there.
>
> THE WITNESS: I did some internet research.
>
> THE COURT: Okay, and in the course of your research, looking at his business, looking at the industry, et cetera, did you see evidence that * * * [exchange] transactions are done with some regularity or whatever?
>
> THE WITNESS: I didn't see that in my research. It probably wasn't that in-depth.

The revenue agent also conducted an income probe. In conducting an income probe a revenue agent determines whether there is an imbalance between the taxpayer's deposits into a bank account and the taxpayer's expenditures according to the taxpayer's bank statements, third-party reporting, and the taxpayer's lifestyle. During trial the revenue agent agreed with the Court that the imbalance might look like "the 40-acre estate with ponies and Mercedes in the driveway." The Court asked the revenue agent: "Do you see the 40-acre estate with the Mercedes and the ponies?" The revenue agent replied: "No".

[*24] The revenue agent reconstructed Mr. Mileham's costs of goods sold using the bank accounts disbursement analysis. The revenue agent did not use any invoices in making his determination. This had the effect of omitting from the costs of goods sold any exchange transactions except to the extent that an exchange transaction resulted in a net purchase, and even then only if the purchase was made through Mr. Mileham's bank account.[5] In contrast, the revenue agent accepted the gross receipts reported on the returns, which included gross sales from exchange transactions.

IX.    Notice of Deficiency

The Commissioner issued a notice of deficiency for 2009, 2010, and 2011 on April 15, 2014. For those years the Commissioner determined that Mr. Mileham had overreported his costs of goods sold by $10,462,311, $27,707,196, and $578,738 for 2009, 2010, and 2011, respectively.[6] The Commissioner made other correlative adjustments but did not adjust gross receipts. The Commissioner

---

[5]The revenue agent determined that the costs of goods sold from all of Mr. Mileham's accounts were $29,637,449, $20,132,159, and $31,732,315 for 2009, 2010, and 2011, respectively.

[6]We note that this is a change from the revenue agent's determination. For 2009 this is an increase to cost of goods sold of $7,900, and for 2011 this a decrease to cost of goods sold of $13,870.

[*25] determined that Mr. Mileham is liable for an addition to tax and an accuracy-related penalty for each year.

X.     Tax Court Proceeding

While residing in Illinois, Mr. Mileham timely petitioned the Court for redetermination. Mr. Mileham challenges the Commissioner's determination that he overreported his cost of goods sold for each year. He also challenges the imposition of an addition to tax and an accuracy-related penalty for each year. In his amended petition he alleges that he overreported his gross receipts for each year.

Before trial Mr. Mileham filed a motion to shift the burden of proof. We reserved ruling on this motion. For the reasons more fully addressed below, we will deny this motion.

Trial was held in St. Louis, Missouri, on March 23 and 24, 2016.

At trial the parties submitted largely overlapping sets of Mr. Mileham's invoices as voluminous exhibits. The Commissioner submitted Exhibit 23-R, which included invoices for purchases and sales. Mr. Mileham submitted Exhibits 32-P, 33-P, and 34-P, which focus exclusively on his purchases. Mr. Mileham testified that he sought out from third parties and found additional documents that he included in his exhibits. Mr. Mileham totaled the purchases from his invoices

[*26] and third-party receipts, including invoices that were not dated, and determined that the costs of goods sold for 2009 and 2010 were $39,325,505 and $40,801,645, respectively. He did not use his yearend summaries because he had lost them.

We reserved ruling on these exhibits subject to posttrial objections. After trial the Commissioner filed a motion in limine to exclude certain invoices in Exhibits 32-P, 33-P, and 34-P. We will issue an order admitting Exhibit 23-R because Mr. Mileham did not file an objection; and for the reasons more fully stated below, we will issue an order denying the Commissioner's motion in limine and admitting Exhibits 32-P, 33-P, and 34-P.

In their briefs the parties made various concessions. Mr. Mileham concedes the additions to tax for failure to timely file for 2010 and 2011. The Commissioner concedes the deficiency and the accuracy-related penalty for 2011. The Commissioner also recalculated Mr. Mileham's costs of goods sold through dated invoices, PayPal purchases, and bank statement purchases and subtracted net purchases. In doing so, the Commissioner conceded additional costs of goods sold of $248,905 and $1,764,153 for 2009 and 2010, respectively.

**[\*27]**                                      OPINION

The only item the parties ask us to redetermine is Mr. Mileham's costs of goods sold for 2009 and 2010.[7]  Mr. Mileham acknowledges that his evidence does not establish the amounts reported on his returns and asks that we estimate his total cost of goods sold for 2009 and 2010.  Additionally, we must decide whether he is liable for a section 6651(a)(1) addition to tax for 2009 and section 6662(a) accuracy-related penalties for 2009 and 2010.

Before deciding the issues in this case we must first address outstanding evidentiary issues.

---

[7]The parties abandoned various arguments posttrial.  Mr. Mileham alleged at trial that the notice of deficiency was arbitrary and capricious such that it should be dismissed.  Because Mr. Mileham does not address this argument on brief, we deem this issue abandoned.  See Mendes v. Commissioner, 121 T.C. 308, 312-313 (2003).

Mr. Mileham alleged in his amended petition that he had overreported his gross receipts.  Because he did not address overreporting his gross receipts at trial or on brief, we deem this issued abandoned.  See id.

The Commissioner alleged at trial that Mr. Mileham was not entitled to use the cash method of accounting.  However, because the Commissioner did not raise the issue on brief, we deem this issue abandoned.  See id.

**[*28]** I.    <u>Evidentiary Matters</u>

At trial the parties submitted their version of Mr. Mileham's business records for each year.  The Commissioner filed a motion in limine asking that we exclude certain documents in Mr. Mileham's exhibits, alleging that these documents are not authentic and that they are prejudicial because they were not timely exchanged.  The documents the Commissioner seeks to exclude fall into two categories:  Mr. Mileham's split invoices and third-party invoices.

Nothing in the record leads us to question that Mr. Mileham's records are genuine.  The Commissioner does not dispute the authenticity of the third-party invoices.  And with respect to Mr. Mileham's split invoices, we are not persuaded that they are not authentic.  We follow the Federal Rules of Evidence.[8]  Rule 901(b)(4) of the Federal Rules of Evidence provides that documents with distinctive characteristics may satisfy the authentication requirements.  A review of the documents that the Commissioner asks us to exclude demonstrates that they suffer from the same flaws as Mr. Mileham's other invoices.  Many of them are undated or lack other substantiating descriptions.  The markings and notations on Mr. Mileham's split invoices satisfy the requirements of rule 901(b)(4) of the Federal Rules of Evidence.

---

[8]Sec. 7453; <u>see also</u> Rule 143(a).

**[*29]** Moreover, we are not persuaded that the relevance of the documents is substantially outweighed by unfair prejudice.[9] The documents in his exhibits are relevant to the issue of determining Mr. Mileham's costs of goods sold. The Commissioner argues that he is prejudiced because the documents were not timely exchanged. Mr. Mileham alleges that the documents were timely exchanged, but he testified that he added to his exhibits some additional documents that he found before trial. Nevertheless, the Commissioner had the opportunity to cross-examine Mr. Mileham on his split invoices and the third-party invoices. Therefore, we hold that the Commissioner's inability to cross-examine Mr. Mileham regarding these additional documents is not so prejudicial as to outweigh their probative value.[10]

II.    Burden of Proof

In general, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving otherwise.[11] Mr. Mileham argues, through his briefs and by motion, that the burden of proof should

---

[9]See sec. 7453; Fed. R. Evid. 403.

[10]The Commissioner also asks that we exclude the Commissioner's own workpapers and evidence of expenses other than costs of goods sold. Because we did not rely on these documents, we will deny this part of the motion as moot.

[11]Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

[*30] shift to the Commissioner for two reasons: He properly complied with section 7491(a) and the Commissioner's determinations in the notice of deficiency were arbitrary and excessive.

A. Section 7491(a)

Mr. Mileham argues that the burden of proof should shift under section 7491(a). Section 7491(a) places on the Commissioner the burden of proof with respect to any factual issue related to a taxpayer's tax liability if the taxpayer maintained adequate records, satisfied applicable substantiation requirements, cooperated with the Commissioner, and introduced credible evidence during the court proceeding on the factual issues.[12] The taxpayer bears the burden of showing that the requirements of section 7491(a) have been met.[13]

Mr. Mileham contends that he met the requirements. We disagree. Section 7491(a)(2)(A) and (B) requires Mr. Mileham to comply with the substantiation and record maintenance requirements of the Code. Section 6001 requires taxpayers to substantiate the amount claimed as cost of goods sold and maintain

---

[12]Sec. 7491(a)(2); Higbee v. Commissioner, 116 T.C. 438, 441 (2001).

[13]See sec. 7491(a); Higbee v. Commissioner, 116 T.C. at 443; see also Rolfs v. Commissioner, 135 T.C. 471, 483 (2010), aff'd, 668 F.3d 888 (7th Cir. 2012).

[*31] sufficient records for that purpose.[14] As discussed below, Mr. Mileham

failed to comply with the substantiation and recordkeeping requirements.

Therefore, the burden does not shift to the Commissioner under section 7491(a).

B.      Arbitrary and Excessive

Mr. Mileham argues that the Commissioner's determination was arbitrary

and excessive within the meaning of Helvering v. Taylor, 293 U.S. 507, 514-515

(1935), and asks that we shift the burden to the Commissioner. The taxpayer must

demonstrate that the Commissioner's deficiency determination is arbitrary and

excessive.[15] Mr. Mileham argues that the determination was arbitrary and

excessive because the Commissioner did not account for the purchases in his

exchange transactions nor adjust the gross receipts when he adjusted the costs of

goods sold.

_____

[14]Sec. 6001; sec. 1.6001-1(a), Income Tax Regs.; see also Higbee v. Commissioner, 116 T.C. at 440; Rodriguez v. Commissioner, T.C. Memo. 2009-22, 97 T.C.M. (CCH) 1090, 1091 (2009); Said v. Commissioner, T.C. Memo. 2003-148, 85 T.C.M. (CCH) 1353, 1355 (2003), aff'd, 112 F. App'x 608 (9th Cir. 2004).

[15]Helvering v. Taylor, 293 U.S. 507, 515 (1935); Pittman v. Commissioner, 100 F.3d 1308, 1313 (7th Cir. 1996) (holding that a determination is presumed correct if it has a rational foundation and is not arbitrary and excessive), aff'g T.C. Memo. 1995-243; Zuhone v. Commissioner, 883 F.2d 1317, 1325 (7th Cir. 1989), aff'g T.C. Memo. 1988-142; see also Mui v. Commissioner, T.C. Memo. 2013-83, at *6-*7; Tharp v. Commissioner, T.C. Memo. 1989-406, 57 T.C.M. (CCH) 1190, 1199 (1989).

[*32] Mr. Mileham argues that the Commissioner acted arbitrarily by excluding invoices showing purchases from exchange transactions in determining the deficiencies. We disagree. The arbitrary and excessive doctrine is not a challenge to the Commissioner's evidence; it is a challenge to the determination that bears no factual relationship to the taxpayer's liability.[16] Courts have consistently refused to examine the materials that were before the Commissioner or the propriety of the Commissioner's administrative procedures in order to ascertain whether he relied on improper evidence.[17] If a taxpayer fails to maintain adequate books and records, it is well established that the Commissioner may determine the taxpayer's income by any method that clearly reflects income.[18] The Commissioner has great latitude in making these determinations.[19] The reconstruction need only be reasonable in the light of all surrounding facts and circumstances.[20] Because the revenue agent found that the costs of goods sold

---

[16]Pittman v. Commissioner, 100 F.3d at 1313; Zuhone v. Commissioner, 883 F.2d at 1325; Mui v. Commissioner, at *7.

[17]Zuhone v. Commissioner, 883 F.2d at 1325.

[18]Sec. 446(b); Petzoldt v. Commissioner, 92 T.C. 661, 686-687 (1989).

[19]Giddio v. Commissioner, 54 T.C. 1530, 1533 (1970).

[20]Petzoldt v. Commissioner, 92 T.C. at 687; Giddio v. Commissioner, 54 T.C. at 1533.

**[*33]** would not total the amounts reported on the returns and that many of the invoices were not credible, it was not arbitrary to reconstruct Mr. Mileham's costs of goods sold using bank statements.

Mr. Mileham further argues that the burden should shift because the Commissioner accepted gross receipts from exchange transactions but adjusted the costs of goods sold. In making this argument Mr. Mileham relies on two companion cases: Hendrickson v. Commissioner, T.C. Memo. 1983-560, 46 T.C.M. (CCH) 1363 (1983), and Engles Coin Shop, Inc. v. Commissioner, T.C. Memo. 1983-561, 46 T.C.M. (CCH) 1367 (1983).

A close examination of these cases reveals that neither addresses the burden of proof for cost of goods sold when the Commissioner accepts gross sales but adjusts cost of goods sold. In Engles Coin Shop, Inc., we did not address this issue.[21] And although the facts in Hendrickson are closer to Mr. Mileham's in that the Commissioner adjusted cost of goods sold but not gross receipts, the Court did not make a ruling as to the burden of going forward on the cost of goods sold

---

[21]Engles Coin Shop, Inc. v. Commissioner, T.C. Memo. 1983-561, 46 T.C.M. (CCH) 1367, 1369-1370 (1983) (explaining that concessions by the Commissioner at or during the course of trial ordinarily are insufficient to shift the burden of proof to the Commissioner).

[*34] issue.[22] The Court addressed only the burden of proof with respect to the gross receipts.[23]

Instead, we have held that the Commissioner has no obligation to try to show that the taxpayer's income was less than the figures reported on the return. In Stafford v. Commissioner, T.C. Memo. 1983-650, 47 T.C.M. (CCH) 172 (1983), the taxpayer petitioned for redetermination of a deficiency in which the Commissioner accepted the taxpayer's gross receipts but disallowed the cost of goods sold and other deductions.[24] We held that the Commissioner's determination was not arbitrary and excessive and that the Commissioner was not obligated to show that the amount of gross receipts was less than the figures reported on the return.[25] In this case the Commissioner was under no obligation to adjust the gross receipts. The Commissioner's determination not to adjust gross receipts was not arbitrary.[26]

---

[22]Hendrickson v. Commissioner, T.C. Memo. 1983-560, 46 T.C.M. (CCH) 1363, 1367 (1983).

[23]Hendrickson v. Commissioner, 46 T.C.M. (CCH) at 1366-1367.

[24]Stafford v. Commissioner, T.C. Memo. 1983-650, 47 T.C.M. (CCH) 172, 175 (1983).

[25]Stafford v. Commissioner, 47 T.C.M. (CCH) at 175.

[26]Because we have found that the Commissioner's determination was not

(continued...)

**[\*35]** III.   <u>Cost of Goods Sold</u>

A taxpayer engaged in a manufacturing or merchandising business may subtract cost of goods sold from gross receipts to arrive at gross income.[27]  Cost of goods sold is the amount that the taxpayer expended to purchase or construct the inventory sold during the year.[28]  Cost of goods sold is an offset to gross receipts for the purpose of calculating gross income; it is not a deduction, which is subtracted from gross income to arrive at taxable income.[29]  All amounts claimed as cost of goods sold must be substantiated, and the taxpayer is required to maintain books and records sufficient to establish the amounts of items on the return.[30]

---

[26](...continued)
arbitrary, we need not address whether it was excessive.

[27]<u>Rodriguez v. Commissioner</u>, 97 T.C.M. (CCH) at 1092; sec. 1.61-3(a), Income Tax Regs.; <u>see also</u> sec. 1.162-1(a), Income Tax Regs.

[28]<u>Sawyer v. Commissioner</u>, T.C. Memo. 2015-55, at \*33; <u>Kazhukauskas v. Commissioner</u>, T.C. Memo. 2012-191, 104 T.C.M. (CCH) 31, 37 (2012).

[29]<u>Sawyer v. Commissioner</u>, at \*33; <u>Kazhukauskas v. Commissioner</u>, 104 T.C.M. (CCH) at 37.

[30]<u>See</u> sec. 6001; sec. 1.6001-1(a), Income Tax Regs.; <u>see also</u> <u>Rodriguez v. Commissioner</u>, 97 T.C.M. (CCH) at 1091; <u>Said v. Commissioner</u>, 85 T.C.M. (CCH) at 1355.

**[\*36]** When a taxpayer does not have adequate records but the record indicates that he or she clearly incurred an offset to gross income, the Court may estimate the offset on the basis of the evidence.[31] The taxpayer must provide sufficient evidence to provide a basis for the Court to make an estimate and to conclude that an offset occurred.[32] In estimating the amount allowable the Court bears heavily against taxpayers whose inexactitude is of their own making.[33]

Mr. Mileham does not have adequate records. The Commissioner alleges that Mr. Mileham's invoices fall "woefully short" of substantiating Mr. Mileham's costs of goods sold. And although Mr. Mileham alleges his records substantiate the costs of goods sold, he submitted a summary sheet with his Exhibits 32-P and 33-P showing that the invoices do not substantiate the amounts of costs of goods sold reported. Having reviewed Mr. Mileham's records and split invoices, we agree that Mr. Mileham's evidence falls short of substantiating the amounts of

---

[31]Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930); see also Cooper v. Commissioner, T.C. Memo. 1989-82, 56 T.C.M. (CCH) 1349, 1351 (1989).

[32]Cohan v. Commissioner, 39 F.2d at 544; Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985).

[33]Cohan v. Commissioner, 39 F.2d at 544; Cooper v. Commissioner, 56 T.C.M. (CCH) at 1351; Sherrer v. Commissioner, T.C. Memo. 1999-122, 77 T.C.M. (CCH) 1795, 1800 (1999), aff'd, 5 F. App'x 719 (9th Cir. 2001).

[*37] costs of goods sold reported on his returns. Many of Mr. Mileham's invoices are incomplete.[34] On many invoices he omitted the date of the transaction. On other invoices he omitted the name of the other party to the transaction. He often omitted the description or number of the item purchased or sold. And he often omitted the purchase amount, the total amount of the gross purchase or gross sale, and the method of payment. These records are inadequate.

Mr. Mileham also did not maintain his records, which were disorganized, incomplete, or lost. He used his prenumbered invoices in no particular order, he occasionally transferred his loosely completed invoices to a tray at his store, and he sporadically put them in a box at his house. He then allowed third parties access to his invoices without making copies. And some of his documents,

---

[34]Mr. Mileham argues that his records must have been adequate because the Commissioner did not send an inadequate records notice. He cites sec. 1.6001-1(d), Income Tax Regs. (providing that the Commissioner may require a person to keep specific records by providing notice), and provisions in the Internal Revenue Manual (IRM) relating to inadequate records notices. See IRM pt. 4.10.8.16 (May 14, 1999). Mr. Mileham contends that because he did not receive any such notice, his records are sufficient. Neither the regulation nor the IRM requires the Commissioner to issue an inadequate records notice. Moreover, it is a well-settled principle that the IRM does not have the force of law, is not binding on the Internal Revenue Service, and confers no rights on taxpayers. See, e.g., Carlson v. United States (In re Carlson), 126 F.3d 915, 922, 925 (7th Cir. 1997); Eichler v. Commissioner, 143 T.C. 30, 39 (2014); Matthews v. Commissioner, T.C. Memo. 2008-126, 95 T.C.M. (CCH) 1486, 1492 (2008).

[*38] including his yearend summaries, are simply missing.  He did not maintain his records.

However, the evidence clearly indicates that Mr. Mileham is entitled to offset his gross receipts by the costs of goods sold in excess of the amounts allowed by the Commissioner.  As explained above, Mr. Mileham had more purchases from his exchange transactions than were accounted for in the notice of deficiency.  And the record in this case gives us sufficient evidence to make an approximation of the amounts of Mr. Mileham's costs of goods sold.

Mr. Mileham asks us to use a markup over cost to determine his costs of goods sold.  The Court has used percentages to estimate a taxpayer's cost of goods sold.[35]  In Cooper v. Commissioner, T.C. Memo. 1989-82, the Court estimated the taxpayer's cost of goods sold for a wholesale scrap metal business.  The taxpayer did not provide business records to adequately show the amounts of payments for scrap metal.[36]  The Court found that the taxpayer's testimony regarding the markup

_____

[35]Cooper v. Commissioner, 56 T.C.M. (CCH) at 1352 (estimating cost of goods sold based on a markup per pound).

[36]Cooper v. Commissioner, 56 T.C.M. (CCH) at 1351-1352.

[*39] per pound, corroborated by another witness, was sufficient evidence for the Court to make an estimate.[37]

We have sufficient evidence to estimate Mr. Mileham's markup over cost. Although the Commissioner argues that "[t]he record does not show a single transaction in which petitioner bought an item for $x and later sold it for $1.01x", we disagree. The record shows that Mr. Mileham engaged in thousands of transactions each year, including transactions in which he bought and sold the same item on the same day. For the 47 pairs of transactions in which Mr. Mileham purchased and sole the same item in the same day, the median markup over cost was 2.19%.

Moreover, this markup over cost is largely consistent with the testimony of Mr. Mileham and the experts. Mr. Mileham testified that he made a profit between 0.5% and 2% for each transaction. Having observed Mr. Mileham during trial, we find him to be a credible witness. He testified regarding his pricing method and markup over cost with particularity.

And this margin is further corroborated by the experts' testimony of their respective markups and their opinions regarding Mr. Mileham's markup over cost. Mr. Schulz testified that his markup over cost was typically 1% to 2%, and he

---

[37]Cooper v. Commissioner, 56 T.C.M. (CCH) at 1351-1352.

[*40] provided an example of his markup over cost which was a 1.63% markup over cost.  Mr. Teague testified that his company's markups ranged between 0.5% and 2%, and he provided a sample of his purchases and sales of the same item, which showed a 0.29% median markup over cost and a fast turnover rate.  Although the Commissioner complains that the experts' businesses were exclusively wholesale, the witnesses credibly testified that they engaged in retail sales as well.  Thus, we do not find their testimony to be so limited.  Mr. Schulz and Mr. Teague also testified as to Mr. Mileham's markup over cost.  They believed, because of the competitive nature of the market and their experiences in dealing with Mr. Mileham, that his markup over cost would be between 0.5% and 2%.

We are not bound by experts' opinions.[38]  We may accept or reject expert testimony when in our best judgment, on the basis of the record, it is appropriate to do so.[39]  We may also be selective in the use of any portion of an expert's

---

[38]Fed. R. Evid. 702; Parker v. Commissioner, 86 T.C. 547, 561 (1986); see also Sherrer v. Commissioner, 77 T.C.M. (CCH) at 1800-1801.

[39]Fed. R. Evid. 702; Parker v. Commissioner, 86 T.C. at 561; see also Sherrer v. Commissioner, 77 T.C.M. (CCH) at 1800-1801.

**[\*41]** opinion.[40]  In this case we find that the experts' opinions lend support to Mr.

Mileham's median markup over cost as provided in the record, and we will use

them as such.

On the basis of the evidence in this case, we find that there is sufficient

evidence for us to make an estimate.  The invoices in the record demonstrate that

Mr. Mileham had a median markup over cost of 2.19%.  The testimony of Mr.

Mileham, Mr. Schulz, and Mr. Teague supports this markup; they each estimated

the high end of Mr. Mileham's markup over cost to be 2%.  We find that Mr.

Mileham's markup over cost was 2.19%.[41]

IV.     Failure To Timely File Addition to Tax

Section 6651(a)(1) imposes an addition to tax for failing to timely file a

Federal income tax return unless it is shown that the failure is due to reasonable

cause and not due to willful neglect.  The Commissioner bears the burden of

---

[40]See Parker v. Commissioner, 86 T.C. at 561; see also Sherrer v. Commissioner, 77 T.C.M. (CCH) at 1800-1801.

[41]We find Mr. Mileham's markup over cost to be greater than the high end of his own estimated markup or those of Messrs. Schulz and Teague.  But the Court's determination is supported by Mr. Mileham's own records, and any imprecision is caused by his own lack of recordkeeping.

**[\*42]** production for this addition to tax before the burden shifts to the taxpayer to prove that the addition to tax should not apply.[42]

Mr. Mileham agrees that he failed to timely file his return for 2009. The Commissioner has satisfied his burden of production.

A taxpayer is not liable for the addition to tax if he shows the untimely filing was due to reasonable cause and not due to willful neglect.[43] This standard for reasonable cause is one of "ordinary business care and prudence".[44] And the taxpayer must prove that the failure was not a result of wilful neglect, i.e., carelessness, reckless indifference, or intentional failure.[45]

Mr. Mileham alleges that his untimely filing was due to reasonable cause and not due to willful neglect because Mr. Blackburn told him that he would not file Mr. Mileham's return until he received Mr. Mileham's Schedule K-1. We disagree.

---

[42]See sec. 7491(c); Higbee v. Commissioner, 116 T.C. at 446-447.

[43]Sec. 6651(a)(1); Higbee v. Commissioner, 116 T.C. at 447.

[44]United States v. Boyle, 469 U.S. 241, 245-246 (1985); sec. 301.6651-1(c)(1), Proced. & Admin. Regs.

[45]United States v. Boyle, 469 U.S. at 246 n.4; sec. 301.6651-1(c)(1), Proced. & Admin. Regs.

[*43] The Supreme Court has held that a taxpayer's reasonable reliance on the advice of a tax professional regarding a question of law, even when the advice turns out to be a mistake, may constitute reasonable cause and is consistent with ordinary business care and prudence.[46] However, it is the taxpayer's obligation to supply his or her tax professional with complete and accurate records from which to make a reasonable estimate of tax liability.[47]

We are skeptical that Mr. Mileham provided Mr. Blackburn with all of the relevant information to determine his tax liability. The record indicates that Mr. Mileham had the Schedule K-1 before his return was due. Mr. Mileham claims that he was unable to secure a Schedule K-1 in time to timely file his return. However, the C.P.A. preparing Equity One Enterprises' Form 1120S signed the return on September 9, 2010. That same day he addressed a letter to Mr. Mileham, stating that the Schedule K-1 was enclosed. If the return and the letter were sent around this time, Mr. Mileham would have received his Schedule K-1 before the return was due, and he could have timely filed.

---

[46]United States v. Boyle, 469 U.S. at 250; sec. 301.6651-1(c)(1), Proced. & Admin. Regs.

[47]Ahadpour v. Commissioner, T.C. Memo. 2000-68, 79 T.C.M. (CCH) 1583, 1592-1593 (2000), aff'd, 32 F. App'x 319 (9th Cir. 2002); Russell v. Commissioner, T.C. Memo. 2011-81, 101 T.C.M. (CCH) 1363, 1365-1366 (2011); see also Estate of La Meres v. Commissioner, 98 T.C. 294, 315-317 (1992).

**[*44]** Even assuming Mr. Mileham did not have the Schedule K-1, Mr. Mileham could have filed his return to the best of his ability and filed an amended return. Mr. Blackburn stated that he refused to file an incomplete return. But we have previously held that reliance on advice that it was necessary to wait for complete information before filing a return does not necessarily constitute reasonable cause.[48] We have held that a taxpayer has an obligation to file a timely return with the best available information and to file an amended return if necessary.[49] "To hold otherwise would be to make the additions under section 6651(a) optional for any taxpayer who claims to have delayed filing based on attorney advice that the return must be true, correct and complete."[50]

Mr. Mileham did not present any evidence to show that he could not make an estimate of his Schedule K-1 income. Thus, Mr. Mileham should have filed a return with the best available information and amended his return if necessary.

---

[48]Estate of Vriniotis v. Commissioner, 79 T.C. 298, 311 (1982); see also Van Ryswyk v. Commissioner, T.C. Memo. 2009-189, 98 T.C.M. (CCH) 113, 117 (2009); Estate of Campbell v. Commissioner, T.C. Memo. 1991-615, 62 T.C.M. (CCH) 1514, 1523-1524 (1991).

[49]Estate of Vriniotis v. Commissioner, 79 T.C. at 311; Van Ryswyk v. Commissioner, 98 T.C.M. at 117; Estate of Campbell v. Commissioner, 62 T.C.M. (CCH) at 1524.

[50]Estate of Campbell v. Commissioner, 62 T.C.M. (CCH) at 1524.

**[\*45]** Indeed, he had most of the information available to file his return. The only missing information was the Schedule K-1, reporting $3,113. Mr. Mileham had the information for his gross receipts and cost of goods sold, which he reported as $40,284,010 and $40,091,860, respectively. We do not find that his failure to timely file because he was missing the information from the Schedule K-1 was due to reasonable cause and not willful neglect.

## V.    Accuracy-Related Penalty

Section 6662(a) and (b)(1) and (2) imposes a 20% accuracy-related penalty on any portion of an underpayment of tax that is due to, among other things, any negligence or disregard of rules or regulations or a substantial understatement of income tax. The term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of the Code, and the term "disregard" includes any careless, reckless, or intentional disregard.[51] Additionally, a taxpayer is negligent if he fails to maintain sufficient records to substantiate the items in question.[52] An understatement of income tax is "substantial" when that understatement exceeds the greater of 10% of the tax required to be shown on the

---

[51]Sec. 6662(c); Higbee v. Commissioner, 116 T.C. at 448.

[52]See Higbee v. Commissioner, 116 T.C. at 449; sec. 1.6662-3(b)(1), Income Tax Regs.

[*46] return or $5,000.[53]  Only one accuracy-related penalty may be imposed with respect to a given portion of an underpayment, even if that portion is attributable to more than one of the types of conduct provided for in section 6662(b).[54]

The Commissioner bears the burden of production for this penalty before the burden shifts to the taxpayer to prove that the penalty should not apply.[55]  The Commissioner has established that the portion of the underpayment of tax was due to negligence.  The Commissioner presented evidence that Mr. Mileham failed to keep adequate books and records to substantiate the reported costs of goods sold.  As explained, Mr. Mileham's records were inadequate, disorganized, or lost.  Thus, the Commissioner has met his burden of proving that the portions of the underpayments of tax attributable to the costs of goods sold were due to negligence for 2009 and 2010.

In accordance with this opinion, Mr. Mileham's exact understatement for each year depends on the Rule 155 computations.  If these computations establish

---

[53]Sec. 6662(d)(1)(A).

[54]See sec. 1.6662-2(c), Income Tax Regs.

[55]See sec. 7491(c); Higbee v. Commissioner, 116 T.C. at 446-447.

**[\*47]** a substantial understatement of income tax for 2009 or 2010, the Commissioner will have met his burden of production with respect to that year.[56]

The accuracy-related penalty will not apply to any portion of the underpayment for which a taxpayer establishes that he or she had reasonable cause and acted in good faith.[57] A taxpayer may establish that he or she had reasonable cause and acted in good faith through reliance on the advice of a tax professional.[58] The reliance must have been reasonable and in good faith under all the circumstances.[59] To demonstrate that the reliance was reasonable and in good faith, the taxpayer must prove that "(1) [t]he adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided

---

[56]See Olagunju v. Commissioner, T.C. Memo. 2012-119, 103 T.C.M. (CCH) 1653, 1662 (2012); Jarman v. Commissioner, T.C. Memo. 2010-285, 100 T.C.M. (CCH) 599, 602 (2010).

[57]Sec. 6664(c)(1); Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); Higbee v. Commissioner, 116 T.C. at 448.

[58]Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 98; sec. 1.6664-4(c), Income Tax Regs.

[59]Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 98-99; sec. 1.6664-4(b)(1), (c), Income Tax Regs.

[*48] necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment."[60]

Mr. Mileham argues that the accuracy-related penalty should not apply because he acted with reasonable cause and in good faith by relying on the advice of his return preparer. But Mr. Mileham's lack of recordkeeping is unrelated to any advice he received from Mr. Blackburn. Mr. Mileham did not rely on any adviser's judgment with respect to his recordkeeping.

Taking into consideration all the facts and circumstances, we find that Mr. Mileham did not show that he had reasonable cause and acted in good faith with respect to his underpayment relating to cost of goods sold for 2009 and 2010.

Moreover, Mr. Mileham did not provide the necessary and accurate information to Mr. Blackburn. He did not provide Mr. Blackburn with his split invoices or his bank statements. Instead, Mr. Mileham totaled his split invoices and gave Mr. Blackburn raw numbers to input onto the return. We have held that a taxpayer cannot escape a section 6662(a) accuracy-related penalty merely by providing raw numbers to a tax professional to prepare a return.[61] The mere fact

---

[60]Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 99.

[61]See Minchem Int'l, Inc. v. Commissioner, T.C. Memo. 2015-56, at *58.

**[\*49]** that a tax professional has prepared a return does not mean that he or she has opined on any or all of the items reported therein.[62]

Lastly, Mr. Mileham did not show that he relied on Mr. Blackburn's advice when he reported his costs of goods sold. There is no evidence that Mr. Blackburn advised Mr. Mileham as to the correct amounts to report as his costs of goods sold. Accordingly, Mr. Mileham is liable for section 6662(a) accuracy-related penalties for 2009 and 2010.

## VI.    Administrative and Litigation Costs

In his posttrial brief Mr. Mileham asserts that he is the prevailing party and is entitled to costs and fees in an unspecified amount pursuant to section 7430. Section 7430(a) provides that a prevailing party in a civil tax proceeding may be awarded reasonable administrative and litigation costs in connection with the proceeding. Rule 231(a)(2) provides that an award of administrative and litigation costs may be claimed, unless conceded by the Commissioner, only upon written motion after the issuance of an opinion determining the issues in the case or after the parties have settled all the issues in the case other than litigation costs. At the time Mr. Mileham requested an award, we were still deciding significant issues in

---

[62]See Minchem Int'l, Inc. v. Commissioner, at \*59 (citing Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 100).

**[\*50]** this case. Therefore, Mr. Mileham failed to meet the procedural requirements under Rule 231.

## VII. Conclusion

Mr. Mileham did not establish that the burden should shift or that he met the requirements to shift the burden under section 7491(a). Although Mr. Mileham did not substantiate his costs of goods sold, there is sufficient credible evidence for the Court to estimate his costs of goods sold using his markup over cost. We hold that Mr. Mileham's markup was 2.19% over his cost. Mr. Mileham stipulated that he failed to timely file his 2009 return; therefore, the Commissioner has met his burden of production for an addition to tax for failure to timely file for 2009. Mr. Mileham has not established that his lateness was due to reasonable cause and not due to willful neglect because his reliance on his return preparer's belief that he could not file a return until he had complete information was unreasonable. We hold that the Commissioner met his burden of production for accuracy-related penalties under section 6662(a) due to negligence for 2009 and 2010 because Mr. Mileham failed to maintain adequate books and records, and the Commissioner may have met his burden of production for underpayments due to substantial understatements of income tax under section 6662(b)(2), depending on the Rule 155 computations. Mr. Mileham has not established that he had

[*51] reasonable cause and acted in good faith when he relied on the advice of his tax professional for reporting his costs of goods sold. Finally, Mr. Mileham's request for administrative and litigation costs under section 7430 is premature.

To reflect the foregoing,

<u>An appropriate order will be issued, and decision will be entered under Rule 155</u>.